# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Moore*, 2012 IL App (1st) 100857

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. WILLIAM MOORE, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-10-0857 |
| Filed | February 1, 2012 |
| Rehearing denied | March 7, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's convictions for murder and aggravated criminal sexual assault were reversed and the cause was remanded for a new trial where defendant's trial counsel was ineffective in unreasonably failing to object to the admission of the other crimes evidence on the interrogation video, especially when there was a reasonable probability that the outcome would have been different if an objection had been made. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-4658; the Hon. Stanley J. Sacks, Judge, presiding. |
| Judgment | Reversed and remanded. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Jonathan Yeasting, all of
State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and
Peter D. Fischer, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE STEELE delivered the judgment of the court,
with opinion.

Justices Neville and Salone concurred in the judgment and the opinion.

## OPINION

¶ 1    Following a jury trial in the circuit court of Cook County, defendant William Moore was found guilty of the murder and aggravated criminal sexual assault of Magdelena Idzikowska. The trial judge sentenced Moore to concurrent terms of natural life and 30 years in prison on these convictions. On appeal, Moore argues: (1) the evidence was insufficient to convict; (2) he was denied due process of law by the trial court's *sua sponte* decision to give all of the police interrogation video to the jury; (3) he received ineffective assistance of trial counsel, who failed to raise various objections to the admission of the interrogation video; (4) he was denied the right to confront the witnesses against him where the DNA evidence was introduced through the testimony of a supervisor who did not conduct the DNA analysis; (5) the trial court failed to adjudicate his claim of racial discrimination in jury selection; and (6) he received ineffective assistance of trial counsel, who referred to an alternate suspect in the opening statement, but should have known the evidence would be barred. We conclude defense counsel's unreasonable failure to object to the admission of other crimes evidence on the interrogation digital video disks (DVDs) created a reasonable probability that the outcome of the trial would have been different and that the result of the proceeding is unreliable. For the following reasons, we reverse and remand the case for a new trial.

¶ 2                                   BACKGROUND

¶ 3    The record on appeal discloses the following facts. On March 4, 2008, Moore was indicted for the murder and aggravated criminal sexual assault of Magdelena between November 24-25, 2001. In June 2009, Moore filed a motion to suppress statements he made to the police. During a status hearing on the motion, the parties informed the trial judge Moore's statements were on DVDs and agreed the trial judge could review them prior to a hearing on the motion. In July 2009, the State provided copies of the DVDs to the trial judge, noting the police interrogation of Moore extended over two days and eight or nine hours of questioning. In August 2009, the trial judge returned the DVDs to the State. The trial judge stated he spent two days reviewing the DVDs, which he indicated contained seven hours of

interrogation.

¶ 4    Later in August 2009, during another status hearing on the motion, defense counsel and the trial judge both characterized Moore's statements on the DVDs as consistent denials of various allegations against him. Defense counsel informed the trial judge the motion to suppress statements was primarily concerned with an allegedly inculpatory statement made when Chicago police took Moore to a hospital. The State told the trial judge that it might seek to offer Moore's denials, but not any statement Moore made outside the room where the DVDs were recorded because "[n]othing is documented." Defense counsel told the trial judge that as a matter of trial strategy, she would not seek to suppress the DVDs, although the State may view Moore's denials as false exculpatory statements. The trial court asked Moore whether he understood and agreed with defense counsel's decision to withdraw the motion to suppress statements; Moore said he did.

¶ 5    At trial, Wanda Idzikowska testified her daughter Magdelena had lived with her in Chicago and worked as an interpreter and clerk at Union Health Service (UHS). Wanda would share Magdelena's car, a Nissan Altima, and occasionally smoke cigarettes while in the car. Wanda last saw Magdelena at approximately 11 p.m. on November 24, 2001. According to Wanda, Magdelena was dating a man named Juwan at the time.

¶ 6    Israel Gonzalez testified that on November 25, 2001, he worked at a gas station and mini-mart at Carroll and Ogden in Chicago. As he drove to work that morning, Gonzalez noticed a green Nissan Altima parked on Carroll, approximately a half block east of the station. Gonzalez testified a young lady previously brought the car to the station for service. The car door was open and two feet were hanging out. Gonzalez thought someone, perhaps drunk, had passed out in the car.

¶ 7    After Gonzalez opened the gas station, he was waved over to the car by a man named Claude Howard, who worked at a nearby mill.[1] Gonzalez saw the naked body of a woman in the backseat of the car, with the legs sticking out and covered in blood from the chest up. Gonzalez ran back to the gas station and dialed 911. The police arrived 5 to 10 minutes later.

¶ 8    Chicago police forensic investigator Steven Strzpek testified that he and his partner arrived at the scene at approximately 10 a.m. The area around the Nissan was already roped off. According to Strzpek, the body in the backseat was naked, except the jeans and underwear were wrapped around her ankles and she was still wearing one boot. A bra was entangled in the jeans.

¶ 9    Strzpek also testified the body had gunshot wounds to the face, chest and leg. Strzpek observed cartridges inside and outside the car, indicating a semiautomatic pistol was used in the killing. According to Strzpek, investigators bagged the victim's hands to preserve trace or DNA evidence under the fingernails, photographed the scene, took blood swabs from the backseat under the victim, and collected hair standards and an acrylic fingernail from the floor of the car.

¶ 10   Strzpek further testified investigators recovered cartridges inside and outside the car, as

---

[1]Howard died before trial in this case.

well as bullet fragments from the rear passenger door and the trunk. The rear driver-side window of the car was shattered. Strzpek observed the victim was wearing a ring and bracelet on her bloody hand. No coat, blouse, purse, or identification was found at the scene.

¶ 11 Dr. Kendall Crowns, a medical examiner, performed the autopsy on Magdelena's body. Dr. Crowns testified Magdelena died of multiple gunshot wounds and there was evidence of close-range fire. The toxicology results were negative for heroin, cocaine and alcohol. Vaginal and rectal swabs were taken and tested for seminal fluid. Dr. Crowns added that the presence of semen in a rectal swab did not necessarily indicate anal sex, but could be an artifact of the swabbing process or the movement of semen due to gravity. There was no evidence of vaginal or rectal trauma or genital bruising. Dr. Crowns could not say whether a sexual assault occurred, but testified these findings did not preclude the conclusion that a forcible sexual assault occurred.

¶ 12 Douglas Ridolfi, a forensic scientist with the Illinois State Police, determined there was semen on the vaginal and rectal swabs. Ridolfi added that sexual intercourse could have occurred anytime within three days of the victim's death, perhaps earlier. Karen Abbinanti, another forensic scientist with the Illinois State Police, testified the underwear and blue jeans recovered from the car tested negative for semen. Abbinanti added that the underwear did not appear to be torn.

¶ 13 Dr. Robin Cotton, an associate professor and director of the biomedical forensic sciences program at the Boston University School of Medicine, testified that from 1988 to 2006, she was the lab director for Orchid Cellmark (Cellmark), a private DNA testing facility. Dr. Cotton was responsible for approving all lab protocols, reviewed cases, signed case reports and did technical review. During her tenure at Cellmark, the lab had a contract with the Illinois State Forensic Services Lab to test evidence in cases where no suspect had been identified and no prior tests had been performed.

¶ 14 Dr. Cotton testified that in 2002 and 2004, Cellmark analysts conducted DNA analysis on the vaginal and rectal swabs and generated profiles for the victim and the sperm fraction of the samples. Analysts compared the DNA from the semen sample to that of seven men, including Juwan Spurill, but not Moore. No match was found. Analysts also analyzed DNA from cigarette butts recovered from the car and found one matched Spurill, one matched Magdelena, and one matched an unknown female. Dr. Cotton did not personally conduct or observe the DNA testing.

¶ 15 Tamara Colon testified that in November 2001, she had been working with Magdelena at UHS for approximately a year. She called Magdelena "Maggie." Colon met Moore in 1997 or 1998, when they both worked for Cub Foods at Elston and Logan in Chicago. Colon continued to socialize with Moore after she left Cub Foods. Colon stated Moore had never been inappropriate with her.

¶ 16 Colon testified that in October 2001, Moore visited her at work, bringing a card around "Sweetest Day," although the two never had a romantic relationship. Colon introduced Moore to Magdelena. At lunchtime, the three went for a ride in Moore's car. According to Colon, Moore and Maggie talked during the ride, but she did not see them exchange telephone numbers. Afterward, Colon and Moore never discussed Magdelena until after she

was found dead, at which time Moore expressed sorrow to Colon. Moore and Colon did not speak as frequently thereafter.

¶ 17　　Colon further testified she told the police Magdelena needed money to move out of her parents' house. Colon also told the police Magdelena could be flirtatious with men and tried to charm them into lending her money.

¶ 18　　Gary Carmody testified that in November 2001, he was the assistant store manager of a Cub Foods in Joliet, Illinois. Carmody supervised Moore at this store, although Moore also worked at the Cub Foods at Elston and Logan in Chicago.

¶ 19　　Juwan Spurill, who lived and worked in Georgia at the time of trial, testified that in November 2001, he was 21 years old and lived in Bellwood, Illinois, with his father, stepmother and brothers. He had been dating Magdelena, whom he first met on their school bus when they attended different schools, for approximately a year. According to Spurill, they had a great relationship and planned to marry, but lacked the money to move out of their families' homes.

¶ 20　　Spurill testified that on November 24, 2001, he was with Magdelena until 10:30 p.m., when he left for his job at the H&M Railroad. According to Spurill, Magdelena said she had a headache and was going home to lie down. At one point, she said she was going out for the night, but then said she was joking. Spurill also testified that he received a telephone call from Magdelena when he arrived at work at approximately 10:45 p.m., during which she said she found a parking spot in front of her house and was going inside to take a Vicodin and lie down. Spurill further testified he worked until 6:45 a.m. on November 25, 2001, and never left the rail yard. Spurill acknowledged a 2006 conviction for aggravated battery of a police officer and a 2007 conviction for felony driving on a suspended or revoked license.

¶ 21　　Jaton Brown, manager at the H&M Railroad terminal at 14th and Western, worked the night shift from November 24-25, 2001. Brown testified he would have known if Spurill left work that night and stated he did not. Brown added he and Spurill ate together that night, although he did not recall the exact time.

¶ 22　　Wanda Hale testified she was Moore's live-in girlfriend and was dating Moore in November 2001. Wanda stated she called Moore "Benny."

¶23　　Linda Thomas, the custodian of records for AT&T, identified the records from November 23-28, 2001, for the telephone registered to Magdelena. Ryan Harger, the custodian of records for Sprint Nextel, identified similar records for the telephone number last called from Magdelena's telephone, registered to a Helen Wright. Those records showed numerous calls from Magdelena's telephone to and from the Wright phone, including the final call from Magdelena's telephone, lasting 23 minutes and 35 seconds, beginning at 11:24 p.m. on November 24, 2001.

¶ 24　　Chicago police detective Michael Hammond testified he was one of several detectives assigned to this case. Detective Hammond testified they analyzed Magdelena's telephone records and began to focus on the final number dialed from her telephone. In the course of the investigation, the police contacted Carmody in an effort to identify the owner of the telephone last dialed from Magdelena's telephone. The police discerned a pattern and then spoke to Hale.

¶ 25    According to Detective Hammond, the police spoke to Wright in late 2003 or early 2004, but kept investigating, speaking again to Carmody and Hale in 2004. The police continued to investigate the final number dialed from Magdelena's telephone, visiting several Cub Food stores and looking for someone named Benny.

¶ 26    After further investigation, on May 17, 2004, Detective Hammond and other detectives met Moore at the Chicago Police Academy. Moore requested the meeting there because he had been a confidential informant for a commander who worked at the academy. The police told Moore they were investigating a 2001 murder and gave Moore *Miranda* warnings, although he was not under arrest or told he was a suspect. Moore agreed to speak to the police.

¶ 27    Detective Hammond testified that Moore told the police he did not know a girl named Maggie. When shown a photograph of Magdelena, Moore stated he met her once, when he was introduced to her by Colon. Moore told the police he had no relationship with Magdelena.

¶ 28    Detective Hammond also testified that Moore told the police he never owned a cell phone and specifically denied owning a Nextel cell phone in November 2001. Detective Hammond noted that Moore was wearing a cell phone in a holster on his waist; Moore responded that he got the cell phone recently and forgot he had it. When Moore was told someone with a cell phone had talked to Magdelena just before her death, Moore again denied having a cell phone then and ever having spoken to Magdelena beyond their one meeting. The police asked Moore whether he knew Hale, whom he admitted knowing. Moore also stated he worked at the Cub Foods stores in Chicago and Joliet, and provided his address and family addresses.

¶ 29    Detective Hammond further testified that the police showed Moore some of the Nextel telephone records, noting the calls placed to Cub Foods and to telephones at his and his family's addresses. Moore then admitted he had possessed the Nextel cell phone, which he described as a "burnout phone" operated under a false address and used in the drug trade. Moore stated he had the phone for a short period of time, but gave it to a known drug user named Johnson before Thanksgiving in 2001 and never used the cell phone afterward. Moore added that Johnson had been killed in a robbery.

¶ 30    The police then showed Moore additional Nextel telephone records, noting the calls to his places of employment and family continued after Thanksgiving 2001. Moore admitted he had not given the cell phone away and there was no one named Johnson. Moore also admitted he spoke to Magdelena more than once after their initial meeting. Moore stated he and Magdelena exchanged telephone numbers when they first met and she asked him to "hook her up with some players." Moore added they spoke by telephone several times after that, but he never met her again.

¶ 31    Moore could not recall his exact whereabouts on November 24, 2001. Detective Hammond testified Moore first denied, then admitted receiving a telephone call from Magdelena that night. Moore told the police he took the call as he was leaving a card or dice game with a man named Derrick Coleman. Moore stated he handed the telephone to Coleman and believed Magdelena and Coleman discussed meeting or hooking up, although

he did not discuss the conversation with Coleman. Moore told the police he did not tell the truth at first because he was afraid of Coleman.

¶ 32    Derrick Coleman testified he knew Moore, but denied ever receiving a cell phone from Moore or ever knowing Magdelena.

¶ 33    Moreover, Detective Hammond testified Moore denied any sexual relationship with Magdelena. Moore agreed to the police taking a DNA sample with a buccal swab of the inside of his cheek. Detective Hammond requested Moore's sample be compared with the prior DNA profiles generated in the investigation.

¶ 34    Brian Schoon, a forensic scientist with the Illinois State Police, testified that on May 24, 2004, he received the buccal standard taken from Moore and was able to obtain a DNA profile therefrom suitable for comparison. Schoon determined that Moore's DNA profile matched that generated from Magdelena's vaginal and rectal swabs. Using FBI statistics, Schoon calculated that the DNA profile at issue would be found in 1 in 2.7 quintillion African-Americans, 1 in 52 quintillion Caucasians and 1 in 260 quintillion Hispanic unrelated individuals. Schoon explained a quintillion is a billion billions and there are approximately 6 billion people on Earth, allowing him to say the sperm fraction of the swabs is consistent with having originated from Moore within a reasonable degree of scientific certainty.

¶ 35    Detective Hammond testified Moore was arrested on February 5, 2008, and brought to Area 4 police headquarters. Detective Hammond and another detective interviewed Moore and recorded the interview on video, as required by law. Detective Hammond identified three digital disks encompassing the interview, which ran from approximately 9 to 10 p.m. through 11 a.m. or noon the next day. Several excerpts from the interview were shown to the jury. On cross-examination, defense counsel asked Detective Hammond whether Moore complained about not having his medication on a part of the video not shown to the jury. Detective Hammond responded that Moore stated he needed medication from home. Defense counsel also asked Detective Hammond whether only parts of the video were shown to the jury; Detective Hammond agreed this was correct. Defense counsel further asked Detective Hammond whether the "snippets" of video were shown to the jury in chronological order, to which Detective Hammond responded that he did not know.

¶ 36    In a sidebar conference following Detective Hammond's testimony, the trial judge asked the State whether the jury could use the video equipment, to which a prosecutor responded that the deputy could be instructed to operate it. The trial judge then stated the jurors would be allowed to watch the entire video if they wanted to see it, due to the evidence elicited about Moore's complaints about not having medication. Defense counsel initially raised no objection, but later objected when the trial judge stated the jury would be given the video without asking for it. Defense counsel noted the State could have asked for the entire video to be played in court and claimed "[w]e're putting in evidence that has not been in fact admitted." Defense counsel also argued the State could have answered any concerns raised by the cross-examination during redirect examination. The trial judge ruled that the jury could view "the parts that are damaging, the parts that are helpful, the entire thing."

¶ 37    Moore called George Carlos as a witness. Carlos testified that on November 25, 2001,

he was employed at ADM Milling and saw the Nissan blocking the company's truck entrance, but noticed nothing unusual about it. However, when he and his coworker Claude Howard were walking back to work from the gas station, he saw the car door open and the naked body in the backseat. Carlos testified Howard ran back to the gas station while he contacted his supervisor. At the time of the trial, Carlos was jailed on a pending sexual assault charge, which Moore's counsel mentioned in the opening statement, but was barred from introducing into evidence.

¶ 38    Moore also recalled Detective Hammond as a witness. Detective Hammond testified that Colon told him that when Moore first met Magdelena, the two joked with each other and Magdelena told Moore he should hook her up with some players. Lastly, the parties stipulated a police report indicated Magdelena's mother said she last saw Magdelena at 9 p.m. on November 24, 2001.

¶ 39    During the jury instruction conference, defense counsel objected that the interrogation video may refer to an inculpatory statement Moore made in the car on the way to the hospital. The State disagreed and the trial judge agreed with the State. Defense counsel withdrew the objection. During closing arguments, both counsel and the trial judge all referred to the fact that the jury would be able to view the entire interrogation video.

¶ 40    The jury deliberated and found Moore guilty of murder, including an enhancement for proximately causing death with a firearm, and aggravated criminal sexual assault. Moore filed a motion for new trial, which the trial judge denied. During the sentencing hearing, the trial judge noted Moore's health problems, but imposed a natural life sentence to dissuade any official from lessening the sentence due to health issues. The trial judge also imposed a concurrent 30-year term of imprisonment on the conviction for aggravated criminal sexual assault. Moore filed a timely notice of appeal to this court.

¶ 41                                    DISCUSSION

¶ 42    On appeal, Moore argues: (1) the evidence was insufficient to convict; (2) he was denied due process of law by the trial court's *sua sponte* decision to give all of the interrogation video to the jury; (3) he received ineffective assistance of trial counsel, who failed to raise various objections to the admission of the interrogation video; (4) he was denied the right to confront the witnesses against him where the DNA evidence was introduced through the testimony of a supervisor who did not conduct the DNA analysis; (5) the trial court failed to adjudicate his claim of racial discrimination in jury selection; and (6) he received ineffective assistance of trial counsel, who referred to an alternate suspect in the opening statement, but should have known the evidence would be barred. In this case, the third issue is largely dispositive and the primary focus of our opinion.

¶ 43    Moore argues that he received ineffective assistance of trial counsel, because she failed to object to the trial court's *sua sponte* decision to give all of the interrogation video to the jury on the grounds that it contained: (1) detailed discussions of Moore's prior crimes and past wrongs; (2) the detectives' statements of opinion that Moore was lying and guilty; and (3) hearsay, including prior consistent statements by witnesses made years prior to trial. Generally, in order to show ineffective assistance of counsel, a defendant must establish: (1)

counsel's representation fell below an objective standard of reasonableness; and (2) counsel's alleged deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We must show great deference to the attorney's decisions as there is a strong presumption that an attorney has acted adequately. *Strickland*, 466 U.S. at 689. A defendant must overcome the strong presumption the challenged action or inaction "might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999) (and cases cited therein). Every effort must "be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Because effective assistance refers to competent and not perfect representation, mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent. *People v. Calhoun*, 404 Ill. App. 3d 362, 383 (2010) (and cases cited therein).

¶ 44 To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate a reasonable probability that the outcome of the trial would have been different or that the result of the proceeding was unreliable or fundamentally unfair. *Strickland*, 466 U.S. at 687; *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Such a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. If a reviewing court finds that the defendant did not suffer prejudice, it need not decide whether counsel's performance was constitutionally deficient. *People v. Buss*, 187 Ill. 2d 144, 213 (1999).

¶ 45 We begin with the question of whether defense counsel could have successfully objected to providing portions of the interrogation video to the jury. Defense counsel is not required to make losing motions or objections in order to provide effective legal assistance. *People v. Mercado*, 397 Ill. App. 3d 622, 634 (2009). Absent a potential judicial error, a defendant cannot show counsel's performance created a reasonable probability that the result of the proceeding would have been different. See *People v. Schneider*, 375 Ill. App. 3d 734, 751 (2007).

¶ 46 Moore first notes the "other crimes" evidence contained in the interrogation video. The principles for admitting other crimes evidence are well established. Evidence of crimes for which a defendant is not on trial is inadmissible if relevant merely to establish the defendant's disposition or propensity to commit crime. *People v. Thingvold*, 145 Ill. 2d 441, 452 (1991); *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). Evidence of other crimes is objectionable not because it has little probative value but rather because it has too much. *People v. Lucas*, 151 Ill. 2d 461, 485 (1992). Such evidence overpersuades a jury, which might convict the defendant only because it feels that defendant is a bad person who deserves punishment. *Thingvold*, 145 Ill. 2d at 441. "The erroneous admission of evidence of other crimes carries a high risk of prejudice and ordinarily calls for reversal." *People v. Lindgren*, 79 Ill. 2d 129, 140 (1980).

¶ 47 Evidence of the commission of other crimes committed by the defendant is admissible when such evidence is relevant to establish any material question other than the defendant's propensity to commit a crime. *Thingvold,* 145 Ill. 2d at 452. However, when evidence of other crimes is offered, the trial judge must weigh its probative value against its prejudicial effect and exclude the evidence if its prejudicial effect substantially outweighs its probative

value. *Illgen*, 145 Ill. 2d at 365. Where its prejudicial effect substantially outweighs its probative value, introducing evidence of other crimes, even in rebuttal of the defense, is reversible error where the result of the trial may have been affected. See, *e.g.*, *People v. Manning*, 182 Ill. 2d 193, 212 (1998).

¶ 48 Given these concerns, where evidence of unrelated offenses is contained in an otherwise competent statement or confession, it must be deleted before the statement or confession is read to the jury, unless to do so would seriously impair its evidentiary value. *People v. Lampkin*, 98 Ill. 2d 418, 430 (1983). The "completeness doctrine" provides that " 'if one party introduces part of an utterance or writing the opposing party may introduce the remainder or so much thereof as is required to place that part originally offered in proper context so that a correct and true meaning is conveyed to the jury.' " *People v. Williams*, 109 Ill. 2d 327, 334 (1985) (quoting *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 556 (1976)). However, the right to introduce an entire writing or conversation is not absolute, but depends on the relevancy of the additional parts of the writing or conversation the party wishes to introduce. *Id.* at 335. The doctrine of completeness does not give the party an automatic right to introduce material which is otherwise inadmissible. *People v. Wilson*, 123 Ill. App. 3d 798, 805 (1984). Otherwise inadmissible evidence may be admitted only where a defendant opens the door to such material and its exclusion would mislead the jury. See *People v. Jackson*, 202 Ill. 2d 361, 370-71 (2002) (distinguishing *People v. Jefferson*, 184 Ill. 2d 486, 495-96 (1998)).

¶ 49 In this case, a review of the interrogation video shows that the police questioned Moore about a prior incident of domestic violence to which Moore apparently pleaded guilty. In the video, the police indicate they interviewed the woman involved in the incident, who claimed Moore punched her and broke her jaw after finding her with another man. Moore states in the video that he learned the woman was hurt when she was granted an order of protection. The police later revisited this incident to ask whether Magdelena did something to make him snap, as he did previously with the woman. As Moore notes, the inclusion of the woman's account of the incident raises not only an other crimes issue, but also a confrontation clause issue. See *People v. Feazell*, 386 Ill. App. 3d 55, 66 (2007).

¶ 50 Moore also notes that a detective refers to Moore's prior history of robberies. Moore denies this assertion. Although Moore fails to support his denial by citation to the record, the prejudicial impact on a jury would be the same in either event.

¶ 51 Moore further notes references on the interrogation video to his prior history as a drug dealer and membership in the Vice Lords street gang. "[E]vidence indicating a defendant is a member of a gang or is involved in gang-related activity is admissible only where there is sufficient proof that membership or activity in the gang is related to the crime charged." *People v. Strain*, 194 Ill. 2d 467, 477 (2000). Given the case law and the circumstances of this case, we conclude that the trial judge would have excluded the irrelevant, unfairly prejudicial other crimes evidence had defense counsel specifically objected to its admission.

¶ 52 In contrast Moore's argument that counsel should have objected on the grounds the video contained hearsay and police opinions of his credibility and guilt is not well founded. In *People v. Hanson*, 238 Ill. 2d 74, 101-02 (2010), the Illinois Supreme Court ruled the circuit

court did not err in admitting testimony by a detective that defendant's sister, Jennifer, believed defendant had committed the murders. The *Hanson* court rejected an argument similar to Moore's here:

> "Defendant first asserts that the testimony at issue was improper opinion testimony. We disagree. Detective Nilles did not testify that he believed defendant was guilty. Nor did Jennifer testify that she believed defendant was guilty. Rather, both Nilles and Jennifer testified to a statement which indicated, at the time the statement was made, that Jennifer thought defendant had caused the victims' deaths. At no time was any testimony offered as to Jennifer's present opinion of defendant's guilt or innocence. Thus, while defendant may arguably challenge the testimony as to relevance and hearsay concerns, we reject defendant's argument that this testimony constituted improper opinion testimony." *Hanson*, 238 Ill. 2d at 101.

Where the testimony is not a current comment on the defendant's credibility (see *People v. Munoz*, 398 Ill. App. 3d 455, 488-89 (2010) (and cases cited therein)), the police accusations may be seen as a standard interrogation tactic, rather than an improper opinion on Moore's credibility. Turning to the hearsay objection, the *Hanson* court reasoned:

> "In this case, the State did not seek to admit Jennifer's statements to prove that defendant was guilty or even to prove that Jennifer thought defendant was guilty. Instead, Detective Nilles's testimony provided context for his investigation and for testimony pertaining to defendant's state of mind based on defendant's response to Nilles's questioning." *Hanson*, 238 Ill. 2d at 102.

Hanson supports the conclusion that the statements of others on the video were not hearsay, but admissible to show the course of the investigation. Accordingly, we are left with the other crimes evidence as the focus of our analysis.

¶ 53    We first consider whether counsel's failure to object to the admission of other crimes evidence might have been the product of sound trial strategy. The State offers no strategic reason for the failure to object to this irrelevant, unfairly prejudicial evidence. We can think of no strategic reason ourselves. Instead, the State argues only that it was admissible because defense counsel "opened the door" to admission of the entire video. Our prior discussion of the applicable case law makes clear this is incorrect as to the other crimes evidence.

¶ 54    We next consider whether counsel's failure to object to the admission of other crimes evidence created a reasonable probability that the outcome of the trial would have been different or that the result of the proceeding was unreliable or fundamentally unfair. The State argues it was unlikely that the jury watched the video in this case, given that the jury deliberated for only 5 1/2 hours. However, as the State also notes, the video "consists mostly of defendant in a room alone sleeping," which suggests the jury could have watched the interrogation portions of the video during its deliberations. Indeed, as Moore notes, most of the unfairly prejudicial material appears in the first hours of the video.

¶ 55    The State cites no authority empowering this court to speculate as to which evidence the jury specifically considered during its deliberations. In this case, the jury was instructed to consider all the evidence and to weigh the credibility of the witnesses in light of all the evidence. "The jury is presumed to follow the instructions that the court gives it." *People v.*

*Taylor*, 166 Ill. 2d 414, 438 (1995). Moreover, the record here shows that during closing arguments, both counsel highlighted the fact that the jury would be able to watch the entire interrogation video. Furthermore, at the conclusion of the trial judge's oral jury instructions, the trial judge specifically mentioned that the jury would have the DVD interview of Moore in its entirety, adding, "You can watch any, all or none, whatever you like to do."

¶ 56    The State also argues the outcome of the trial was not affected by the admission of the video, because the evidence against Moore was overwhelming. In this case, the evidence shows that Moore had some relationship with Magdelena, received the final telephone call placed from Magdelena's telephone, had sexual intercourse with Magdelena within three days of her death, and lied to the police about these facts. There was no evidence of vaginal or rectal trauma, or genital bruising. Dr. Crowns could not say whether a sexual assault occurred. There was no evidence directly linking Moore to a murder weapon or directly placing him at the scene. This circumstantial evidence is sufficient to convict (see, *e.g.*, *People v. Saxon*, 374 Ill. App. 3d 409, 418 (2007)), but contrary to the State's assertion (and that of the trial judge), it is not overwhelming.

¶ 57    In short, Moore received ineffective assistance of trial counsel. Given our resolution of this issue, we need not address the remaining issues Moore raised in this appeal.

¶ 58                                                    CONCLUSION

¶ 59    Given the facts and circumstances presented by the record before us, we conclude that defense counsel's unreasonable failure to object to the admission of other crimes evidence on the interrogation DVDs created a reasonable probability that the outcome of the trial would have been different and that the result of the proceeding is unreliable. Hence, we find Moore received ineffective assistance of trial counsel. As the evidence was sufficient to allow a rational trier of fact to find defendant guilty beyond a reasonable doubt, double jeopardy does not bar a retrial. *E.g.*, *People v. Fillyaw*, 409 Ill. App. 3d 302, 316-17 (2011). Accordingly, we reverse the judgment of the circuit court of Cook County and vacate Moore's conviction. We remand the cause to the circuit court for a new trial.

¶ 60    Reversed and remanded.