NOTICE

Decision filed 01/30/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 200120-U

NO. 5-20-0120

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 18-CF-70 |
| | ) | |
| AARON ISAACSON, | ) | Honorable |
| | ) | Jeffery B. Farris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Presiding Justice Boie and Justice Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's convictions for possession of methamphetamine and possession of drug paraphernalia are reversed where defense counsel did not provide effective assistance under the two-prong test provided in *Strickland v. Washington*, 466 U.S. 668 (1984). Thus, we remand for a new trial.

¶ 2    This is a direct appeal from the circuit court of Union County. The defendant, Aaron Isaacson, appeals his convictions for possession of methamphetamine and possession of drug paraphernalia. He was convicted by a jury and sentenced by the trial court to three years' imprisonment on the possession of methamphetamine charge and 364 days' imprisonment in the county jail for the possession of paraphernalia charge.

1

For the reasons that follow, we reverse the defendant's convictions and remand for a new trial.

¶ 3                                I. BACKGROUND

¶ 4    On March 29, 2018, the defendant was charged by information of unlawful possession of methamphetamine, a Class 3 felony, where he knowingly and unlawfully possessed less than five grams of methamphetamine or a substance containing methamphetamine; and unlawful possession of drug paraphernalia, a Class A misdemeanor, where he knowingly and unlawfully possessed an item of drug paraphernalia, being a glass pipe with the intent to use it to inhale methamphetamine.

¶ 5    On December 6, 2019, the State filed a motion *in limine* to impeach the defendant by use of prior convictions should the defendant choose to testify under Illinois Rule of Evidence 609 (eff. Jan. 6, 2015). Specifically, the State sought to admit the defendant's prior conviction from April 13, 2017, for aggravated fleeing or eluding a police officer, a Class 4 felony for which the defendant was sentenced to 24 months' probation. See *People v. Isaacson*, No. 17-CF-167 (Cir. Ct. Williamson County, Apr. 13, 2017).

¶ 6    On December 9, 2019, the trial court held a hearing on the motions *in limine* prior to commencing the jury trial. The court heard argument on the State's motion to impeach the defendant with prior convictions should he choose to testify. The State argued that where the defendant was currently on probation for a Class 4 felony conviction in 2017, and based on the fact that the defendant had so many pending cases, the probative value of this conviction did not outweigh the damage of unfair prejudice and that the State should be allowed to use evidence of this conviction should the defendant choose to

testify. The defendant did not object to the State's motion under the circumstances and the court granted the motion. Thereafter, the trial commenced.

¶ 7　On December 10, 2019, the State began with opening statements. At one point, while describing what evidence would be presented, the State explained that: "So about that time the responding officer, Josh Schildknecht with the Union County Sheriff's Office, arrived at the scene. He saw the vehicle, and then he saw the defendant and immediately recognized both. He knows [the defendant] from past encounters, and he also knew that [the defendant] was already wanted on a warrant." The State then called Schildknecht to testify.

¶ 8　Schildknecht testified that he was a road deputy at the Union County Sheriff's Office. He was on duty on March 28, 2018, when he encountered the defendant. A call was received reporting a possible vehicle crash in Giant City State Park on one of the horse trails. He arrived at the scene and observed a 1995 Honda del Sol. The vehicle was located northeast of Giant City Lodge and approximately 40 yards off the Indian Creek access road.

¶ 9　Upon arriving at the scene, Schildknecht noted that he recognized the vehicle. In his duties as a deputy, he had encountered the vehicle numerous times prior to this incident. The exterior of the vehicle was in "rough shape." One of the doors was held together with a wire and one of the windows and the front windshield had large cracks. The defendant was inside the vehicle and two employees from the Illinois Department of Natural Resources (IDNR) who worked at Giant City were also present. The hiker(s)

3

who had made the call and reported the vehicle was/were not at the scene. He was the only officer that had arrived at that point.

¶ 10 The State asked Schildknecht: "Are you also familiar with [the defendant]?" to which Schildknecht indicated that he was. The State followed up, asking, "Have you had any other encounters with [the defendant] in the past?" Schildknecht responded that he had, and defense counsel objected for improper character evidence. The trial court held a brief sidebar. The following dialogue occurred:

"THE COURT: With this line of inquiry, I'm very close to saying, okay, the things that you can't say.
[THE STATE]: I'm just trying to establish that he knows who he is and that he can identify him.
THE COURT: Right, I understand.
[THE STATE]: I wasn't going to ask him any details about how he knew him.
THE COURT: But that's what I'm saying. But the thing about it is, the fact that he's a cop and he's now said a couple times that he's had several encounters with [the defendant]. So what I'm going to say is, I'm going to sustain the objection at this time. I think you've established—laid the foundation for Deputy Schildknecht to identify [the defendant] and he can identify [the defendant] in open court.
I would be careful with the deputy's—about the line of questioning about: 'Are you familiar with who he is?' 'Yes I'm familiar with who he is.'
[THE STATE]: Okay. I'll stop.
THE COURT: And then, you know, because you don't want to ask—you cannot unring a bell. You don't want to ask him a question and, 'I've arrested his ass.'
[THE STATE]: No, I wasn't going to do that.
THE COURT: I know, but you have asked that question. You just don't know what the response might be. And then you—you know, you see what I'm saying?
[THE STATE]: Right."

¶ 11 Direct examination of Schildknecht then continued. Schildknecht stated that he found the defendant in the driver seat of the vehicle. Schildknecht was aware that there

was a warrant for the defendant's arrest for failure to appear in Union County for a driving on a revoked license charge. He placed the defendant under arrest and put him in the backseat of his squad car. He then verified with dispatch that the warrant was still active. He approached the defendant's vehicle, which had its side door still open, when he saw a small glass pipe lying on the driver's side floorboard.

¶ 12    Schildknecht conducted a search of the defendant's vehicle, which was full of personal items. It appeared to him that the defendant had been living out of his car. The glass pipe that Schildknecht had observed had a white powdery residue on the inside. He believed it to be methamphetamine. He put the pipe with the residue into a sealed evidence bag and secured it in his vehicle. Schildknecht called a tow truck to have the vehicle towed. Once the tow truck arrived, he left Deputy Eric Ralls and Detective Bart Hileman, who had also arrived at this point, at the scene, and transported the defendant and the evidence to the sheriff's office.

¶ 13    Schildknecht admitted that though he was wearing a bodycam that day, he did not have it turned on for the entire interaction with the defendant. He explained that at the time of the incident, bodycams were fairly new and he did not always push the start button hard enough. There was no bodycam footage for the first part of his interaction with the defendant. He did not turn it on until later during the inventory search, when he realized none of the lights were on. His bodycam footage did not start until after the defendant was arrested and Schildknecht had already found the glass pipe.

¶ 14    Once Schildknecht arrived at the sheriff's office, he transported the defendant to the detention area and turned over custody of the defendant to one of the dispatchers for

5

processing. He then took the evidence inside and turned it over to Detective Asa Busby for the purpose of conducting a field test on the residue in the pipe. Busby then conducted the test, which indicated a positive result for methamphetamine. Detective Busby then placed the pipe in a sealed evidence bag and marked it.

¶ 15    On cross-examination Schildknecht gave the following testimony:

> "Q. At what point did you actually search [the defendant]?
> A. I would have searched him before I placed him in my vehicle.
> Q. Okay. And what property did you [*sic*] he have on him at that point?
> A. He always had all kinds of property. [D]on't remember the exact property he had on him. He's always got all kinds of stuff in his pockets."

Defense counsel then had Schildknecht read sections of his police report.

> "Q. *** So then on page 3, would you read for us paragraphs 2 and 3?
> A. 'I observed that [the defendant] was not injured from a crash, it just appeared that way from the state of his vehicle with a heavily damaged windshield, however, it has been that way for a long time.
>     I placed [the defendant] under arrest and in handcuffs using two pairs, checking for proper fit and double locking them. I then removed the property from his pockets and the knife from his belt. I [then] placed the property and [cash] in evidence and the [knife] and lighters in the car.
> * * *
>     *** I then secured [the defendant] in the back seat of my vehicle and requested the next tow, which was Pro-1.
>     While waiting for the tow, I observed a glass pipe with white residue, which I recognized through training and experience as a pipe [used] to smoke methamphetamine, on the driver's side floorboard of [the defendant's] car.
> * * *
>     Upon Pro-1's arrival, I transported [the defendant] to the Sheriff's Office without incident.
>     [Upon arrival] at the Sheriff's Office, I secured [the defendant] in a holding cell. Detective Busby then scraped the white residue from inside the pipe located in [the defendant's] vehicle into a methamphetamine test kit. The white residue tested positive for methamphetamine.
>     I then secured the glass pipe and the $450.00 into evidence bags and sealed them. I then secured the items in evidence locker #2.
>     Nothing further at this time.' "

¶ 16   Schildknecht admitted that he had testified about this incident twice previously under oath, once at a grand jury proceeding and again at a forfeiture hearing on the defendant's vehicle and the $450 cash.

> "Q. Okay.  And would you take a look at this document I'm presenting to you.
> A. I'm familiar with it.
> Q. Can you identify it for the record?
> A. It's a transcript of that seizure hearing—
> Q. Okay.
> A. —forfeiture hearing.
>
> * * *
>
> Q. *** If you would, starting with line 3 and going down to the end of the page, if you would.
> A. (WITNESS COMPLIES WITH REQUEST.)  Okay.  This is actually a question/answer.  It's [the State] asking me questions and—'What kind of vehicle was that?'
> 'It was a '95 Honda del Sol, I believe.'
> 'Okay and on' *** 'and on that date, was there a failure-to-appear warrant for [the defendant]?'
> 'I believe so.'
> 'Okay.  And did you arrest him?'
> 'I did.'
> 'And incident to that arrest, what occurred?'
> 'I did a search of that vehicle [and] located some drug paraphernalia.'
> 'What kind of drug paraphernalia?'
> 'A glass meth pipe.'
>
> * * *
>
> 'Okay.  And where was that located in the vehicle?'
> 'It was in a brown paper sack.' "

Schildknecht then admitted that he was now changing his testimony that the glass pipe was not in a brown paper bag but was instead in plain view.  He also admitted that though he was wearing his bodycam, it was not turned on when he saw the pipe on the floorboard.  Schildknecht's bodycam footage was then played in open court.  He testified

that the time stamp on the video read March 28, 2018, 15:32 (3:32 p.m.).  The video then picks up at 4:30 p.m. and again at 4:57 p.m., during the field test of the glass pipe.

¶ 17        On redirect, the following testimony was elicited by the State:

"Q. Deputy Schildknecht, with regard to that forfeiture hearing and Defense Exhibit 2, that transcript, let's go back to that date.  That forfeiture hearing took place—let me find the date—on December 18, 2018; is that correct?
A. I believe so.

* * *

Q. Okay.  On the date of that hearing—did that hearing only discuss this incident?
A. No, it did not.
Q. Did it—what else was discussed in that hearing?
A. It discussed a burglary and another—we arrested him for some meth and stolen car parts down at Wright's Towing.
[DEFENSE COUNSEL]: Objection, Judge.
[THE STATE]: Your Honor, he opened this up by bringing up this transcript.
[DEFENSE COUNSEL]: Judge, I did not enter character evidence.  I entered the transcript.
THE COURT: Is the trans—is what was entered in the transcript—
Take the jury out please.
COURTROOM DEPUTY: Yes, sir.
(THE FOLLOWING PROCEEDINGS TOOK PLACE OUTSIDE THE PRESENCE OF THE JURY.)
THE COURT: Please have a seat.  Your objection, [defense counsel]?
[DEFENSE COUNSEL]: My objection, Judge, is that we didn't open the door with character evidence.  We opened the door with—or we did not open the door with character evidence.  We referred to a transcript which was—
THE COURT: For what purpose?
[DEFENSE COUNSEL]: Under-oath testimony of this particular witness for the purpose of impeachment, Judge.
THE COURT: All right.  However, you entered the entire—you moved to enter the entire transcript, correct?
[DEFENSE COUNSEL]: I did do so, Judge.
THE COURT: And without any limiting—without any limitations?
[DEFENSE COUNSEL]: I only referred to those particular pages which I had the witness—
THE COURT: But you entered the entire transcript, wherein lies the problem.
I curiously wondered what else was on this transcript, if it had to do with

8

more than one case or even more than one defendant. All right. And now here we've got the door opened, the bell rung, on prior bad acts.

However, Mrs. Casper [(ASSISTANT STATE'S ATTORNEY)], you realized what was in the transcript because it's your transcript.

[THE STATE]: Right.

THE COURT: You know—

[THE STATE]: I had not intended to enter the transcript until he brought it up.

THE COURT: I understand.

[DEFENSE COUNSEL]: And my point is that I had to get the previous testimony of—or not 'previous'—well, previous to this date, testimony of this particular witness to explore those particular details.

THE COURT: Right, I understand. *** And I will say that that did appear, at least, to be used for the limited purposes of impeachment and of this defendant. However, I believe the more appropriate—

* * *

THE COURT: —which if you say the whole transcript is in, it is not beyond the scope of cross-examination. But if [defense counsel] is using the transcript merely as impeachment, then it is—it is beyond the scope of cross-examination. I know that's not [defense counsel]'s objection, is that you're beyond the scope of cross-examination. However—

* * *

[THE STATE]: And I understand, but in order to rehabilitate this witness and explain why he testified the way he did, I need to explain this other proceeding, because on the date of this hearing, he thought we were coming in to discuss a different case, and he didn't realize that we were discussing two cases. And so when we first went into the testimony, he got the cases confused.

THE COURT: All right.

[THE STATE]: The drugs found in the second case were contained in a paper sack. I believe he's corrected his testimony today, but I need—I mean, it's been opened up to the jury. I need to have the—I need to have an opportunity to have my witness explain that.

THE COURT: Now, that is fair game."

¶ 18 The court went on to further explain that because the defendant was able to impeach Schildknecht with the paper bag testimony, the State was allowed to rehabilitate him with the evidence that there was another case that Schildknecht thought he was testifying about that included a paper bag. The court admonished both the State and Schildknecht that reference to the defendant's other cases in the trial at hand could be the

9

basis for a mistrial. Both Schildknecht and the State stated that they understood, and the jury was brought back into the courtroom. The court then admonished the jury: "I talked to you about this before. We're striking his last answer. And I think I've told you, any testimony or evidence that gets ordered stricken, that you're not supposed to pay attention to, right?" All of the jurors indicated they understood the court's admonishment and Schildknecht's testimony continued.

¶ 19 The State began redirect with rehabilitative questions regarding Schildknecht's impeachment. Schildknecht clarified that the paper bag testimony was in regards to a different case and that he confused the two cases during his testimony at the forfeiture proceeding. He also explained that though he acknowledged there was a time discrepancy between his report and his bodycam, he did not set the time on the bodycam and he had no access to the controls.

¶ 20 During recross-examination, the defense began to question Schildknecht about the location of the money he found on the defendant's person in comparison to the glass pipe. The State made an objection, and during the discussion of the objection, in front of the jury, the trial court referred to the glass pipe as a "crack pipe." Defense counsel immediately objected to that characterization of the pipe, to which the court immediately admitted to, apologized, and recharacterized as an alleged drug-using pipe/pipe with residue on it. The court acknowledged that it misspoke, and the trial continued.

¶ 21 Thanarat Viriyakul, a forensic scientist with the Illinois State Police specializing in drug chemistry, was tendered as an expert by the State in forensic science with regard to

chemistry/drugs. He testified that he analyzed the pipe residue and determined it to be positive for methamphetamine.

¶ 22 Chris Treece, a site tech II in Giant City state park for the IDNR, testified that he was on duty on the date of the offense. He was notified that there was a hiker that was unresponsive on the horse trail and there was some blood on the scene. He arrived on the scene with his coworker, Rob Gross. He testified as to his knowledge of the area and that the vehicle was located in Union County. He also testified to the poor condition of the vehicle and the fact that several bloody rags with electrical tape were visible. He observed an individual, the defendant, in the car and approached him. He asked the defendant if he needed help or was in distress, but there was no response. He attempted to get a response two or three times. The defendant eventually woke up and seemed disoriented for a while. After the defendant got his bearings, he asked if he could just leave instead of receiving medical services. Treece responded that "it's a little bit late for that." Treece heard emergency service vehicles approaching and knew that there was only enough passing space for one vehicle at a time. Schildknecht arrived while Treece was having this conversation with the defendant.

¶ 23 The State called several other witnesses regarding the location of the vehicle and the composition of the residue in the glass pipe before resting. The defense then moved for a directed verdict, which was denied. Thereafter, the trial court confirmed outside the presence of the jury that the defendant did not wish to testify. The court then moved on to its inquiry regarding the exhibits:

"THE COURT: Now, do you have—what about the forfeiture transcript? I

11

just can't—there's so much going on there, and, in fact, there's so much going on there that has, while we're outside the presence of the jury, has to do with your client, isn't there?

      [DEFENSE COUNSEL]: Yes, Judge.

      THE COURT: That is collateral to this case.

      [DEFENSE COUNSEL]: That's correct as far as the additional stuff that's in there. And the part that—I kept it limited in what I used for impeaching the witness in that particular instance to stay within the confines of that limited purpose of impeachment.

      THE COURT: Exactly. I'm not saying I'm deny—but I'm not going to send that back with them because of all of the other stuff that goes with it. You know, I believe that you completed your impeachment and—as well you could and that [the State] rehabbed as well—rehabilitated her witness as well as she could. And I believe that that's what the case I cited: No prior inconsistent statements, unless the record clearly reflects the need for the statements to go back to the jury room and proper instructions are given as to the limited purpose of the specific documents in question.

      And I just don't know how you can limit that and still keep it from being harmful to the Defendant. And so I think it comes across as more harmful than not, don't you?"

The parties agreed with the court that the transcript would be prejudicial to the defendant. Trial resumed and the case was given to the jury.

¶ 24　That same day, the jury found the defendant guilty on both counts, unlawful possession of methamphetamine and unlawful possession of drug paraphernalia. The defendant was sentenced to three years' imprisonment on the possession of methamphetamine charge and 364 days' imprisonment in the county jail for the possession of paraphernalia charge.

¶ 25　On January 8, 2020, the defendant filed a motion for judgment not withstanding of verdict (judgment *n.o.v.*), in arrest of judgment, or for new trial. The motion for judgment *n.o.v.* argued that the jury's verdict was against the manifest weight of the evidence. Specifically, that: (1) arresting officer Schildknecht testified that he did not

12

have his bodycam turned on when he first encountered the defendant or when he found the pipe with methamphetamine residue, and did not turn his bodycam on until after the defendant was secured in his patrol car; (2) Schildknecht's bodycam footage does not show him placing the pipe in an evidence bag; (3) Schildknecht's bodycam footage ends shortly after the arrival of the K-9 unit and does not restart until after Schildknecht is in his patrol car driving the defendant to the sheriff's office; (4) Schildknecht testified that his error in not having his bodycam recording for the entire encounter was due to his unfamiliarity as the equipment was new; (5) Schildknecht's testimony as to the placement of the glass pipe was impeached by prior inconsistent statements; (6) Schildknecht's bodycam footage of the field test on the glass pipe did not show the pipe being taken out of an evidence bag; (7) the maps establishing where the incident occurred were not presented to the jury with north facing up and the presented orientations were conflicting; and (8) the State's witness testified that he could not definitely identify the location were the defendant's car was found on the map introduced by the State. Additionally, the defendant argued that the court erred in overruling the defendant's objection to hearsay evidence which was impermissibly prejudicial to the jury's perception of events; it erred in not admonishing the jury to not do any internet research until the end of Schildknecht's direct examination; Schildknecht's testimony regarding other pending cases against the defendant was impermissibly prejudicial where the defendant did not testify at trial, he did not present any character evidence, the nature of the offense was not one that permitted the entry of evidence of other crimes by the State, and despite a sustained

13

objection, testimony on this topic had already begun and was heard by the jury; and the court improperly referred to the paraphernalia as a "crack pipe."

¶ 26 In the alternative, the defendant's motion alleged that a new trial was warranted where: (1) Schildknecht's testimony regarding other pending cases against the defendant was impermissibly prejudicial where the defendant did not testify at trial, he did not present any character evidence, the nature of the offense was not one that permitted the entry of evidence of other crimes by the State, and despite a sustained objection, testimony on this topic had already begun and was heard by the jury; (2) Schildknecht's testimony naming other criminal allegations in other numbered cases pending against the defendant was impermissibly prejudicial; (3) the State's line of questioning of Schildknecht was ostensibly for the purpose of curing the defendant's impeachment using previous testimony at a forfeiture hearing, though the defendant's counsel had entered the transcript into evidence and said transcript was subsequently withdrawn from evidence by the trial court; and (4) the State's ability to use prior criminal convictions against the defendant had been properly raised in a motion *in limine*. On March 30, 2020, the State filed a response to the defendant's posttrial motion. The court denied the defendant's motion. The defendant appeals.

¶ 27                                  II. ANALYSIS

¶ 28 The defendant raises two issues on appeal: (1) whether he was denied his rights to a fair trial and effective assistance of counsel where his trial counsel failed to object when the State repeatedly introduced irrelevant and prejudicial other-crimes evidence, and (2) whether he was denied effective assistance of counsel where his trial counsel opened

14

the door for other-crimes evidence. As we find the second issue dispositive of this appeal, we decline to address the defendant's first contention.

¶ 29 The defendant argues that his trial counsel was ineffective where effective counsel would have recognized that the risk of "opening the door" to the defendant's other charges for burglary and possession of methamphetamine would have outweighed any potential benefit from impeachment. The State contends, however, that the defendant was not prejudiced by his counsel's representation. We disagree.

¶ 30 Claims of ineffective assistance of counsel are resolved under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). To establish a claim of ineffective assistance of counsel, a defendant must prove that (1) counsel's representation was deficient, *i.e.*, fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687; *People v. Smith*, 195 Ill. 2d 179, 187-88 (2000). To establish that counsel's performance fell below an objective standard of reasonableness, defendant must overcome the strong presumption that, under the circumstances, the challenged action or inaction was the product of sound trial strategy. *People v. Barrow*, 133 Ill. 2d 226, 247 (1989). Because effective assistance refers to competent and not perfect representation, mistakes in trial strategy or judgment will not, of themselves, render the representation incompetent. *People v. Moore*, 2012 IL App (1st) 100857, ¶ 43. To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate a reasonable probability that the outcome of the trial would have been different or that the result of the proceeding was unreliable or

fundamentally unfair. *Strickland*, 466 U.S. at 687; *People v. Evans*, 209 Ill. 2d 194, 220 (2004); *Moore*, 2012 IL App (1st) 100857, ¶ 44. Such a reasonable probability "is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Because a defendant's failure to satisfy either prong of the *Strickland* test will defeat a claim of ineffective assistance, a court is not required to address both prongs of the inquiry if defendant makes an insufficient showing as to one. *People v. Edwards*, 195 Ill. 2d 142, 163 (2001). Even if the evidence is sufficient to convict, the proper remedy for a defendant deprived of effective assistance of counsel is to reverse defendant's conviction and remand for a new trial. *People v. Young*, 306 Ill. App. 3d 350, 356 (1999).

¶ 31 The term "other-crimes evidence" refers to misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which defendant is on trial. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 35. Other-crimes evidence is unquestionably prejudicial to a defendant. See *People v. Donoho*, 204 Ill. 2d 159, 170 (2003) ("such evidence has 'too much' probative value," rendering a jury inclined to convict defendant not because of its belief in defendant's guilt, but rather on its belief that defendant is a bad person deserving of punishment); *People v. Fletcher*, 335 Ill. App. 3d 447, 449 (2002) ("providing proof of an accused's penchant for criminal behavior would control the decision-making process, resulting in convictions based upon past guilt instead of current evidence").

¶ 32 The record establishes that defense counsel sought to introduce prior testimony of Schildknecht for the purpose of impeaching his testimony. However, this action by

16

counsel allowed the State to bring in otherwise inadmissible evidence regarding other charges (other-crimes evidence) the defendant was facing. As to the first prong of the *Strickland* test, the record demonstrates that defense counsel's introduction of the entire forfeiture hearing transcript, without limitation, demonstrated representation that fell below an objective standard of reasonableness. It is undisputed by the parties that defense counsel's impeachment of Schildknecht and the subsequent admission of the entire forfeiture hearing transcript into evidence led to the introduction of other-crimes evidence against the defendant. Though there is a strong presumption that counsel's conduct was the product of sound trial strategy (*Strickland*, 466 U.S. at 689), this court fails to find that defense counsel's introduction of the other-crimes evidence relating to the defendant was sound trial strategy. In fact, as cited above, defense counsel argued vehemently against the State's rehabilitation of Schildknecht using the transcript that defense counsel entered into evidence without limitation.

¶ 33    As to the second prong of the *Strickland* test, prejudice, we find that the result of the proceeding was unreliable or fundamentally unfair. The record establishes that, absent the cross-examination by defense counsel of Schildknecht, and counsel's efforts to impeach him, the other-crimes evidence against the defendant would not have been introduced. As to the evidence against the defendant, despite Schildknecht's testimony, the reporting witness/es were never identified or questioned; there was no bodycam footage of the plain-view discovery that led to the defendant's charge; and there was no testimony from Treece, the IDNR employee, that corroborated Schildknecht's testimony regarding the glass pipe. Our analysis leaves us no confidence in this verdict. Therefore,

we find that the defendant received ineffective assistance of counsel, and we reverse and remand the cause for a new trial.

¶ 34                                    III. CONCLUSION

¶ 35    Based on the foregoing reasons, we reverse and remand the defendant's conviction for possession of methamphetamine and possession of drug paraphernalia.

¶ 36    Reversed and remanded.