NOTICE
Decision filed 10/14/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180387-U

NO. 5-18-0387

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Union County. |
| | ) | |
| v. | ) | No. 13-CF-150 |
| | ) | |
| CURTIS CARR, | ) | Honorable |
| | ) | Mark M. Boie, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WHARTON delivered the judgment of the court.
Justices Welch and Barberis concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not abuse its discretion in admitting a portion of a recorded police interrogation during which officers told the defendant that they knew what happened and that they believed what the victim told them where the defendant made relevant statements in response. Due to the overwhelming evidence of the defendant's guilt, the court's failure to give Illinois Pattern Jury Instructions, Criminal, No. 11.66 did not constitute plain error, and counsel's failure to request the instruction did not satisfy the prejudice element of the *Strickland* test. The court properly explained the four Rule 431(b) principles to prospective jurors even though it did not address them separately. The court did not abuse its discretion or consider improper matters in sentencing the defendant.

¶ 2   The defendant, Curtis Carr, was convicted of two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2010)). The court sentenced him to consecutive sentences of 25 years on each count. He appeals, arguing that (1) the court erred in refusing to redact a 30-minute portion of a video-recorded interrogation during which officers

1

repeatedly told the defendant that they believed the victim and that they knew he had done what she said he did, (2) the court erred in failing to instruct the jury on how to consider the victim's prior statements, (3) the court did not fully comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012), and (4) his sentence constituted an abuse of discretion. We affirm the defendant's convictions and sentences.

¶ 3                                    I. BACKGROUND

¶ 4     The incident leading to the charges in this case occurred in July 2013. During the summer of 2013, the defendant frequently spent time at the home of his friends, Michael and Tammy Alvis. The Alvises lived in Coello, Illinois, with Tammy's three children. Although Michael was not the biological father of the children, he helped raise them, and they called him Dad. The defendant drove a semi-truck. Tammy's 12-year-old daughter, M.F., thought it would be fun to take a ride in the semi. The Alvises allowed M.F. and her sister, 14-year-old K.F., to accompany the defendant on an overnight trip to Kansas City in his semi on July 4. According to Michael, the defendant suggested the trip. According to M.F., it was her idea.

¶ 5     The Alvises told the girls that they were to sleep together in the bed located in the truck's sleeping compartment and the defendant was to sleep in the front of the truck, on the seats. However, this is not what happened. Instead, K.F. fell asleep in the passenger seat, and M.F. went to sleep in the bed alone. At some point during the night, M.F. awoke to find the defendant next to her in the bed. He told her that he had put his hand down her pants while she slept. We note that M.F. did not recall feeling the defendant's hand in her pants that night, and he was not charged in this incident. M.F. did not tell anyone about the incident, and the family continued to spend time with the defendant.

2

¶ 6    During the month of July 2013, the defendant introduced M.F. and K.F. to his friend, Stephanie Murphy. Stephanie lived in Anna, Illinois, with her brother, Devon, her mother, and a friend. The defendant drove the girls to visit Stephanie in Anna so she could teach them to ride her horses. The first time they went to her home, they returned the same day. The second time, they rode in the defendant's semi and stayed overnight.

¶ 7    They arrived at Stephanie's house in the evening. They ate dinner and then sat outside talking. M.F. went into the sleeping compartment of the defendant's semi while the others were still outside talking. She assumed that K.F. would eventually join her there. Instead, K.F. spent the night in the house with Devon, and the defendant joined M.F. in the sleeping compartment. He removed her pajamas and his clothes. He placed his penis against M.F.'s vagina. He then placed his fingers inside her vagina. The defendant told M.F. not to tell anyone what happened.

¶ 8    M.F. was eventually able to curl up and go to sleep. When she awoke, the truck was moving. Although M.F. did not know where they were going, the defendant drove the truck from Anna, Illinois, to Scott City, Missouri, to pick up a load for his truck. He then returned to Stephanie's house, picked up K.F., and drove both girls home to Coello.

¶ 9    Initially, M.F. did not tell anyone about the incident, but Michael, Tammy, and K.F. noticed changes in her behavior. She became quieter and more withdrawn. Approximately two weeks after the incident, she wrote the following in a journal that had been given to her by K.F.:

> "I am going out with Curtis Carr. He is the best BF that I have had. We kissed and been kissing and been kissing me. And he slept naked—and him slept naked together. We did stuff but I'm still a virgin because he said I'm too hard for his eight inches, but he did give me an orgasm and turned me on a lot."

M.F. put the journal under K.F.'s dresser, intending for K.F. to find it.

3

¶ 10    When K.F. found the journal, she showed it to Michael and Tammy. After reading the journal entry, Michael and Tammy sat down with M.F., K.F., and Tammy's mother, Tammy Flood. When Flood asked M.F. if she had anything to tell them, she was initially reluctant to say anything at all. However, she eventually told her family that the defendant had touched her. She later gave Michael a more detailed account of what had occurred. Michael contacted the police.

¶ 11    The defendant was charged with two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2010)) and one count of aggravated kidnapping (*id*. § 10-1(a)(1)). The matter first came for trial in December 2013. The jury found the defendant not guilty on the aggravated kidnapping charge and was deadlocked on the charges of predatory criminal sexual assault of a child. We note that the vote was 11 to 1 in favor of conviction.

¶ 12    The matter proceeded to trial again in May 2018. Michael Alvis testified that he had known the defendant since he was in eighth grade. The defendant began spending a lot of time at the Alvises' house in June 2013. According to Michael, the defendant invited K.F. and M.F. to visit his friend, Stephanie Murphy, so Stephanie could teach them to ride her horses. The defendant also suggested the overnight trip to Kansas City in his truck.

¶ 13    Michael testified that the girls accompanied the defendant to Stephanie's house approximately three times. The first time, they returned home the same day. The second time, they stayed overnight. This took place on July 15 and 16, 2013. When asked about the sleeping arrangements, Michael stated, "The girls were supposed to sleep in Stephanie's brother's bedroom. He was supposed to sleep on the couch. And Curtis was supposed to sleep in the bedroom with Stephanie."

¶ 14    Michael further testified that when the girls returned from their second visit to Stephanie's house, he began to notice changes in M.F.'s demeanor. He explained that she spent a

4

lot of time alone in her bedroom and that she no longer seemed happy or playful. Michael stated that he asked M.F. what was bothering her, but he "got nothing back." At that point, he did not suspect anything was wrong other than perhaps M.F. was not feeling well. However, he began to suspect the defendant might being doing something inappropriate later that month when the defendant stayed overnight at the Alvis home. Michael testified that he woke up to use the bathroom early in the morning. When he stepped out of his bedroom and closed the door behind him, he saw M.F. go "flying across the couch away from" the defendant. When Michael questioned the defendant about this, the defendant said only that he had pushed M.F. away from him.

¶ 15    Late in July 2013, K.F. showed Michael and Tammy the journal entry written by M.F. According to Michael, Tammy suggested that they call her mother, Tammy Flood, because she believed M.F. would be more comfortable talking to her grandmother than to them. Michael testified that Flood came to the house and the family sat down together to discuss the issue. When Flood asked M.F. if there was something she needed to tell them, she "clammed up." However, when the journal was set down in front of her, M.F. told them that the defendant had touched her. She did not provide any additional details at that time. Michael explained that she did not have the opportunity to do so because Tammy "just blew up" in anger.

¶ 16    Michael further testified that, later the same day, he spoke to M.F. on the phone while he was at work. At that time, M.F. told him "that she woke up with Curt standing over the top of her naked and that he threw himself on top of her and he stripped off her pants. He rolled her over on top of himself and stripped off her shirt and that he tried forcing his penis in her." When asked if M.F. specified when and where this occurred, Michael stated that she told him it happened early in the morning at Stephanie's house.

5

¶ 17    Finally, Michael testified that two days after the girls returned from their overnight visit to Stephanie's house, K.F. admitted that she had been involved in a sexual relationship with Stephanie's brother, Devon Murphy. Michael and Tammy were not happy about this.

¶ 18    M.F. testified that she was born in August 2000. She was 12 years old when the events at issue took place during the summer of 2013, and she was 17 years old at the time of trial. She first testified about the overnight trip to Kansas City. She stated that the trip was her idea, explaining that she thought it would be fun to ride in a semi because it was something she had never done before. She testified that when they stopped to sleep, she went to sleep in the truck's sleeping compartment alone while K.F. and the defendant remained in the front seats. M.F. explained that K.F. was supposed to sleep in the sleeping compartment with her. She did not know why K.F. did not join her in the back.

¶ 19    M.F. testified that she woke up during the night to find the defendant in bed next to her. She could not remember if his body was against hers. She stated that he told her his hands had been in her pants, but they were not there at that time. M.F. was scared, but she was able to get back to sleep. She explained that she did not say anything to her parents about the incident because she was afraid to do so.

¶ 20    According to M.F., the defendant continued to visit their house after the incident, and he offered to bring M.F. and K.F. to Stephanie's house so they could learn to ride horses. She testified that nothing bad happened the first time they visited Stephanie. She could not recall whether they stayed overnight on that visit.

¶ 21    M.F. next testified at length about the second visit to Stephanie's house. She testified that they arrived after dark, but while it was still "kind of early." M.F., K.F., Stephanie, and the defendant ate dinner and they then sat outside talking. M.F. went into the sleeping compartment

of the semi and got into her pajamas while the others remained outside talking. She testified that she and K.F. had been told by their parents to sleep in the truck together, so she thought that K.F. would eventually join her.

¶ 22    She further testified that the defendant came into the sleeping compartment, removed her pajamas, and took his own clothes off. She stated, "And he got on me and tried sticking his penis in my vagina." She testified that although he did not succeed in putting his penis inside her, he did make contact. M.F. explained that the defendant told her it did not fit. She stated that he then put his fingers inside her vagina. She was screaming and crying, and the defendant said, "Scream all you want, nobody can hear you." M.F. testified that the defendant told her not to tell anyone what happened or he would go to prison.

¶ 23    M.F. was able to fall asleep after the defendant stopped touching her. When she awoke the following morning, the truck was moving. She testified that the defendant took her cell phone without asking her and kept it with him in the front of the truck. She further testified that the defendant stopped the truck somewhere, got out, and then got back in the truck and drove back to Stephanie's house to get K.F. After that, he drove straight home, and he returned M.F.'s cell phone to her when they arrived.

¶ 24    M.F. next testified about the journal entry. She explained that she wrote the journal entry and left it where she knew K.F. would find it because she "wasn't sure how to tell anybody" about what happened to her. When asked why she wrote that the defendant was her boyfriend, M.F. explained that she thought that people in relationships did what the defendant did. She noted that he also kissed her.

¶ 25    M.F. identified her handwriting in the journal. Over the defendant's objection, copies of the journal entry were admitted into evidence and published to the jury.

¶ 26    Finally, M.F. was asked about a game called "scooping" or "bean-dipping." She replied, "It's where you walked around, and then they like flipped your boob." She testified that the defendant did this to her and she saw him do it to K.F. as well. She also testified that she and K.F. "scooped" each other at home when they were "just playing around," but they got into trouble for it, so they never did it again. Asked who told them about the game, M.F. stated that the defendant did.

¶ 27    Tammy Alvis, K.F., and Tammy Flood also testified for the State. Both Tammy Alvis and K.F. testified that they noticed that M.F. became quiet and withdrawn after the overnight trip to Stephanie's house. Tammy testified that when the girls returned home that day, M.F. put her clothes next to the washing machine and said she did not feel well. K.F. testified that they were introduced to the "scooping" game by both the defendant and Stephanie. She also testified that she received a text message from M.F.'s phone on the morning of their overnight visit to Stephanie's house telling her that M.F. was in Missouri with the defendant. Tammy Flood testified about the statement M.F. made when the family sat down to discuss the journal entry. Her testimony was mainly consistent with Michael's. However, she testified that M.F. revealed that the defendant touched her inappropriately after Flood assured her that she would love M.F. no matter what.

¶ 28    A recording of a forensic interview of M.F. conducted by Ginger Meyer was played for the jury. Meyer interviewed M.F. at the Two Rivers Child Advocacy Center on August 15, 2013. M.F. told Meyer about the July 4 trip to Kansas City, explaining that the defendant got into the bunk in the sleeping compartment with her while she was sleeping. She stated that when she awoke, he told her he had put his hands in her pants while she was asleep.

¶ 29   M.F. was more reluctant to discuss the overnight visit to Stephanie's house. Initially, she told Meyer that she fell asleep in the truck alone, and that when she woke up, the defendant was holding her. She told Meyer that he took off her clothes, rolled her on top of him, then rolled her back over and got on top of her. She stated that he stopped when she started to scream and cry. Meyer asked M.F. what the defendant did while he was on top of her. M.F. remained silent. Meyer then asked if the defendant touched M.F. with any part of his body. M.F. nodded. She then revealed that the defendant tried to put his "private" inside her "private part" but was unable to put it inside because she was "too tight." M.F. next revealed that the defendant then put his hands in her "private area." She told Meyer that this hurt and that she was scared.

¶ 30   The jury also saw a video recording of Sgt. Chad Brown's interview of M.F., which took place on August 27, 2013. M.F. gave Sgt. Brown less detail than she gave Meyer. She told him that she and K.F. were supposed to sleep in the truck together when they stayed overnight at Stephanie's house, but that instead, K.F. slept in the house with her boyfriend, Devon Murphy. M.F. told Sgt. Brown that the defendant got into the truck with her and kissed her. She stated that they "did stuff," but the defendant told her she was still a virgin.

¶ 31   The State showed the jury a video recording of a police interrogation of the defendant conducted by Officer Mark Stram and Special Agent Nicolas Dill. Prior to the challenged portion of the recording, the defendant told the officers that he did not know why they wanted to interview him. He admitted bringing K.F. and M.F. with him on an overnight trip to Kansas City in his truck and on an overnight visit to Stephanie Murphy's house. He claimed that at Stephanie's house, he slept with Stephanie, K.F. slept with Devon, and M.F. slept on a love seat. The defendant admitted that on the Kansas City trip, he slept in the bunk next to M.F. However, he told the officers that he kept his clothes on and slept with his back facing her.

9

¶ 32    When asked if he had ever touched any young girls inappropriately, the defendant initially denied having done so. However, he then admitted to participating a game called "bean-dipping," which involved "scooping" under a person's breasts. He stated that the game was Devon Murphy's idea.

¶ 33    The 30-minute portion of the recording challenged by the defendant begins with one of the officers telling the defendant, "The girls say that you touched them." After two comments from the officers stating that they "knew" or "believed" that it happened, the defendant admitted that he "scooped" the girls' breasts in the "bean-dipping" game, but he claimed that he never did anything sexual. One of the officers stated, "I know it happened." He explained that he was just "trying to figure out why." The defendant denied touching the girls' "privates."

¶ 34    The defendant continued to deny doing anything inappropriate other than "scooping" the girls' breasts. The interrogating officers made multiple statements the defendant now challenges. One officer stated, "We wouldn't be sitting here talking to you if we didn't know for a fact that this happened." An officer told the defendant, "Obviously, there's some truth" to the girls' accusations. The defendant was asked, "Do you realize that, again, we know this happened?" One of the officers explained that they were giving him a chance to explain what happened because, without an explanation, he looked "like a monster." The officers suggested that the defendant had not had any "female attention" for some time. One stated, "Which, as a guy, we can all understand." At this point, the defendant denied that anything sexual took place in his truck.

¶ 35    When asked who was with him when he drove to Scott City, the defendant acknowledged that M.F. went with him. He claimed that she asked to go along. When confronted with the fact

10

that he had previously said that he was alone on that trip, the defendant said, "Did I?" He then admitted, "I totally fucked that up, didn't I?"

¶ 36    Toward the end of the challenged portion of the recording, one of the officers stated, "The last thing that I would have ever done as an innocent person, okay, is start talking pretty much automatically about the victims in this case. Without being prompted to. Do you realize you did that?" In response, the defendant indicated that he figured that is what his arrest was about. He explained that one night he stayed overnight at the Alvises' home and that M.F. fell asleep on the same sofa he was sleeping on. He stated that at around 5 a.m. Michael woke him up by slamming a door and that Michael "swore up and down" that something was going on. The defendant denied Michael's allegation.

¶ 37    The State presented evidence concerning other similar crimes. Most of this evidence revolved around the defendant's conduct towards C.A., the teenaged daughter of a woman he became romantically involved with while he was out on bond after his first trial in this case. The defendant met C.A.'s mother, Elizabeth M., online in 2015 while she was living in Maryland. The two met in person and became romantically involved when C.A. was 13 years old. C.A. testified that shortly after she and her mother met the defendant in person for the first time, she was alone with him on the back porch of her mother's Maryland home. She stated that the defendant pulled down her pants and put his penis in her vagina. C.A. did not tell anyone about the incident because the defendant threatened to take away her dog and her horse if she did. She further testified that after this incident she and the defendant exchanged phone calls and text messages and communicated via Skype, Facebook, Instagram, and Snapchat. During their communications, the defendant sent her pictures of his "private parts" and asked her for pictures of hers.

11

¶ 38    Detective Mark McDaniel seized cell phones belonging to the defendant and C.A., and Detective Richard Minton performed full data extractions on the phones. Detective Minton testified about the results of his investigation. He uncovered a series of text messages exchanged between the defendant and C.A. in early 2016, during which the defendant asked C.A. if she was "up to having sex again." C.A. indicated that she was, and the two exchanged messages planning to have sex. In addition, Minton discovered that the defendant sent C.A. pornographic images of adults having sex as well as photographs of his own penis and buttocks.

¶ 39    Detective Minton also discovered an exchange of text messages between the defendant and H.S., a girl living in Ohio who was 11 years old at the time the messages were exchanged. Although they did not make specific plans to meet, the defendant repeatedly told H.S. that he wanted to engage in various forms of sexual activity with her. In addition, Detective Minton uncovered six images of child pornography.

¶ 40    The defense presented the testimony of Stephanie Murphy, her friend and roommate, Karen Sovar, and the defendant's mother, Leta Carr. Stephanie testified that the defendant slept with her in her bed when the girls stayed overnight. She acknowledged testifying in a prior proceeding that she woke the defendant up in his truck the next morning. Sovar testified that she looked into Stephanie's room when she passed by on her way to the bathroom during the night. She stated that she saw two adults sleeping in Stephanie's bed. She admitted that she did not remember that night clearly and that she told police that she did not look into Stephanie's bedroom. The defendant's mother testified that defendant loaned the cell phone seized by Detective Minton to another trucker in 2014. She did not say when the phone was returned to the defendant.

¶ 41    The jury returned verdicts of guilty on both charges. The defendant filed a posttrial motion, which the court denied.

¶ 42    The trial court held a sentencing hearing on August 3, 2018. The defendant objected to an addendum to the presentence investigation report (PSI) showing that he had been acquitted on two charges of predatory criminal sexual assault of a child in 2003. In response, the State argued that in sentencing, courts can consider uncharged conduct and conduct which led to an acquittal. The court agreed and overruled the defendant's objection.

¶ 43    As evidence in mitigation, the defendant presented the testimony of his mother. She testified that the defendant had strong ties to his local community and that he had maintained steady employment for many years. She also testified that he was a law-abiding citizen who attended church and had a reputation for being a moral person.

¶ 44    The court also heard a statement by the victim, M.F., detailing the emotional impact the defendant's conduct had on her, followed by the arguments of counsel. The State's attorney characterized the defendant as a "serial child predator," pointing to the evidence at trial that he had contacted underaged girls online and made efforts to "seek them out physically." As factors in aggravation, the State pointed to the serious psychological harm the defendant's conduct caused to M.F. (730 ILCS 5/5-5-3.2(a)(1) (West 2016)) and the need to deter others (*id.* § 5-5-3.2(a)(7)). In written arguments submitted prior to the hearing, the State also argued that the defendant was a danger to the public and that he committed other sex offenses against children while out on bond (*id.* § 5-5-3.2(a)(12)). The State requested the maximum sentence.

¶ 45    The defendant asked for the minimum sentence. Counsel argued that three factors in mitigation were present. First, he pointed out the defendant had no prior criminal history (*id.* § 5-5-3.1(a)(7)). Second, he argued that the character and attitudes of the defendant made it unlikely

13

that he would reoffend (*id.* § 5-5-3.1(a)(9)). In support of this argument, counsel pointed to the evidence that the defendant had been gainfully employed over a long period of time and his mother's testimony that he had stable ties to his community. Third, counsel argued that the defendant's conduct was the result of circumstances that were unlikely to recur (*id.* § 5-5-3.1(a)(8)). He did not explain what circumstances those were.

¶ 46    In pronouncing sentence, the court first noted that it could consider the fact that the defendant was charged with two counts of predatory criminal sexual assault of a child in 2003 even though he was acquitted. The court then stated, "But I believe, more importantly, *** the court is, I think, under a duty for the protection of the public to consider the actions of Mr. Carr after he posted bond after that first trial." The court pointed to the evidence presented during the trial that the defendant solicited a young girl in Ohio, emphasizing that this took place shortly after the defendant was released on bond. The court also highlighted the evidence that the defendant sexually assaulted and sent graphic pictures of himself to his girlfriend's 13-year-old daughter, C.A. The court continued, "I've talked about our victim in this case. I've talked about these two young ladies that the evidence was presented. Those are the only ones we know of, and I am, again, positive that there are others. We just don't know who they are." The court emphasized that it had a duty to protect society, and a duty to protect young girls, "whether it be in southern Illinois, Ohio, [the] East Coast, Arkansas, [or] California." The court sentenced the defendant to consecutive terms of 25 years in prison. This appeal followed. We will discuss additional background information as necessary during our discussion of the issues raised.

¶ 47                                                   II. ANALYSIS

¶ 48    The defendant challenges his convictions, arguing that (1) the court erred in refusing to redact a portion of the interrogation video during which officers repeatedly told him that they

14

already knew what happened and that they believed the victim; (2) the court erred in failing to give Illinois Pattern Jury Instructions, Criminal, No. 11.66 (4th ed. 2000) (hereinafter IPI Criminal), which would have told jurors how to evaluate M.F.'s prior statements; and (3) the court did not fully comply with Rule 431(b). He also challenges his sentence, arguing that it is excessive and constituted an abuse of the court's discretion. The defendant acknowledges that he did not preserve most of these issues for appellate review. He asks us to consider his claims under the plain error doctrine or as claims of ineffective assistance of counsel. We address each of the defendant's contentions in turn.

¶ 49                                    A. Interrogation Video

¶ 50     The defendant first argues that the court abused its discretion in admitting a 30-minute portion of the video recording of his interrogation. He contends that during this portion of the recording, the interrogating officers made numerous statements indicating that they knew he had done what he was accused of and that they believed what the victim and her sister said. The defendant acknowledges that although he objected at trial, he did not raise this issue in his posttrial motion. As such, he has forfeited appellate review of his claim. See *People v. Sebby*, 2017 IL 119445, ¶ 48 (stating that to preserve an issue for appeal, a defendant must both make a contemporaneous objection and address the issue in a posttrial motion, and that failure to do either of these things results in forfeiture). The defendant argues, however, that his contemporaneous objection was sufficient to preserve the error for review, asserting that the purported error was a constitutional error because it deprived him of his constitutional right to receive a fair trial. See *People v. Cregan*, 2014 IL 113600, ¶¶ 16, 18. Erroneous evidentiary rulings are not ordinarily considered constitutional errors even though they can adversely impact a defendant's right to receive a fair trial. *People v. Davis*, 2019 IL App (1st) 160408, ¶ 54. We

15

need not address this argument, however, because we find no error in the trial court's decision to admit the disputed portion of the video. Without error, there can be no plain error. See *People v. Smith*, 372 Ill. App. 3d 179. 181 (2007).

¶ 51   As the defendant correctly points out, opinions as to a defendant's guilt or innocence are not admissible. *People v. Crump*, 319 Ill. App. 3d 538, 542 (2001). However, Illinois courts— including our supreme court—have drawn a distinction between opinions at the time of trial and past opinions expressed during an investigation. See *People v. Hanson*, 238 Ill. 2d 74, 101 (2010); *People v. Suggs*, 2021 IL App (2d) 190420, ¶¶ 14, 17; *People v. Degorski*, 2013 IL App (1st) 100580, ¶¶ 78-79.

¶ 52   Statements made by police officers during an interrogation are generally admissible to demonstrate their effect on the defendant, to explain the defendant's responses to questioning, or to explain the course of the interrogations. See *People v. McCallum*, 2019 IL App (5th) 160279, ¶ 56; *People v. Moore*, 2012 IL App (1st) 100857, ¶ 52; *People v. Theis*, 2011 IL App (2d) 091080, ¶ 33. This is so even if the statements themselves would not be admissible as direct testimony. *McCallum*, 2019 IL App (5th) 160279, ¶ 56; *Theis*, 2011 IL App (2d) 091080, ¶¶ 35-37; *People v. Munoz*, 398 Ill. App. 3d 455, 488 (2010). As the First District observed, accusations made by police during an interrogation "may be seen as a standard interrogation tactic, rather than an improper opinion." *Moore*, 2012 IL App (1st) 100857, ¶ 52.

¶ 53   Although statements made by police during an interrogation are generally admissible, like any other evidence, they should be excluded if their prejudicial effect substantially outweighs their probative value. *McCallum*, 2019 IL App (5th) 160279, ¶ 56. Weighing the prejudicial effect of evidence against its probative value is a matter within the discretion of the trial court. As with other evidentiary rulings, we will reverse the court's determination only if we

16

find that the court abused its discretion. *People v. Roman*, 2013 IL App (1st) 110882, ¶ 23 (citing *People v. Johnson*, 208 Ill. 2d 53, 102 (2003)). Abuse of discretion is a deferential standard of review. *People v. Anderson*, 367 Ill. App. 3d 653, 663 (2006).

¶ 54   The defendant argues that the prejudicial effect of the officers' statements outweighs their probative value because he did not make any inculpatory statements in response to the officers' questioning. He acknowledges that he made two relevant statements during the 30-minute portion of the video he challenges—he admitted that he slept in the sleeping compartment with M.F. and he admitted that he "scooped" the girls. He argues, however, that because neither of these statements came in direct response to the officers' questions, the officers' comments were not probative at all. The defendant therefore contends that the court abused its discretion in allowing the jury to hear the officers' prejudicial statements. We disagree.

¶ 55   We first note that, contrary to the defendant's assertion, he did make other relevant statements in response to police questioning. When confronted with an inconsistent statement he made about who was with him when he drove to Scott City, Missouri, the defendant reacted by acknowledging the inconsistency and saying that he "totally fucked that up." The drive across state lines to Scott City formed the basis of the aggravated kidnapping charge, which was not at issue in the defendant's second trial. However, his response was relevant because it demonstrated an awareness of guilt. In addition, in response to the suggestion that an innocent man would not have mentioned M.F. and K.F. unprompted, the defendant told officers that, despite his earlier assertion to the contrary, he did know why police wanted to interview him. He then went on to corroborate Michael's testimony about the incident in which M.F. moved away from him on the sofa.

17

¶ 56    It is telling that the defendant relies entirely on out-of-state decisions to support his claim that the potential prejudice from the officers' statements substantially outweighed the probative value of the evidence even though there are several Illinois cases that have addressed this question. As the State points out, we should not consider out-of-state decisions where there is a substantial body of Illinois caselaw addressing the issue at hand. See *People v. Lee*, 2019 IL App (1st) 162563, ¶ 43.

¶ 57    Although not cited by the defendant, the Third District found that the prejudicial effect of a portion of an interrogation video substantially outweighed its probative value in *People v. Hardimon*, 2017 IL App (3d) 120772. We find that case instructive because it illustrates the type of interrogation comments that may be prejudicial enough to warrant exclusion despite the general rule that such comments are admissible.

¶ 58    There, as here, the interrogating officers made multiple statements indicating that they knew the defendant was involved in the murder they were investigating and that they did not believe his denials of involvement. *Id.* ¶¶ 19, 21. That is where the similarities to this case end. Several times, the officers told the defendant that the prosecution would easily prevail at trial due to the strength of the evidence against him. *Id.* ¶ 36. One officer told the defendant that a surveillance video would clearly establish his guilt. *Id.* ¶ 23. In reality, however, the surveillance video was of poor quality, and it did not provide a basis for a conclusive identification of the shooter. *Id.* ¶ 39.

¶ 59    The officers also commented extensively on the veracity of their own comments on the state of the evidence. One officer told the defendant, " 'We tell it like it is. Okay? Just like we are doing to you.' " *Id.* ¶ 22. Later in the interrogation, he stated, " 'We don't lie to people.' " *Id.* ¶ 23. He went on to explain that the officers knew that lying to a suspect could cause problems in

18

the future if that suspect was later released and they needed his help in another case. He asked the defendant, " 'Are you going to want to talk to us if we have been blowing smoke up your ass? No. That's why we don't do it.' " *Id.* The other officer stated, " 'Our rep, our rep is always important to us.' " *Id.* The first officer repeated his assertion that they never lied. *Id.*

¶ 60     The differences between the instant case and *Hardimon* could not be more stark. There, the officers repeatedly commented on the strength of the prosecution's case, and one of them "also conclusively stated that the defendant was going to jail for first degree murder." *Id.* ¶ 36. In response, the defendant continued to deny his involvement without changing his version of events. *Id.* ¶ 37. The officers' repeated comments vouching for their own credibility also tended to undermine the notion that their accusations were nothing more than a "standard interrogation tactic" (*Moore*, 2012 IL App (1st) 100857, ¶ 52). Here, by contrast, the officers did not comment on the strength of the State's case, conclusively state that the defendant was guilty of any particular crime, or say anything that might convince jurors that their accusations were anything other than an interrogation tactic. In addition, as previously discussed, the defendant *did* make relevant statements in response, even though he did not confess. As such, we find no error, much less plain error, in the court's decision to admit the contested 30-minute portion of the video recording into evidence. In light of this conclusion, we need not consider the defendant's claim that trial counsel was ineffective for failing to raise the issue in the defendant's posttrial motion. See *People v. DeLuna*, 334 Ill. App. 3d 1, 16-17 (2002) (rejecting a defendant's claim of ineffective assistance of counsel where there was no merit to a motion the defendant contended counsel was ineffective for failing to file).

19

¶ 61                            B. Jury Instructions

¶ 62     The defendant next argues that the court erred in failing to give the jury IPI Criminal No. 11.66. The defendant acknowledges that his counsel did not request the instruction. He urges us to consider the error either under the plain error doctrine or as ineffective assistance of counsel. The State does not dispute that failure to give the instruction was error. Instead, the State argues that the defendant cannot carry his burden of demonstrating that plain error review is appropriate. We agree with the State.

¶ 63     As the defendant correctly points out, the instruction is required when prior statements of child sex abuse victims are admitted into evidence. See *People v. Sargent*, 239 Ill. 2d 166, 190 (2010); *People v. Marcos*, 2013 IL App (1st) 111040, ¶ 50. Here, five prior statements were admitted into evidence—the journal entry, M.F.'s statements to her grandmother and stepfather, and the recorded interviews conducted by Ginger Meyer and Sgt. Chad Brown. Had the instruction been given, jurors would have been instructed that it was up to them to determine whether the statements were made and, if so, how much weight to give them. Jurors also would have been instructed to make these determinations by taking into account M.F.'s age and maturity, the nature of the statements, and the circumstances under which they were made. IPI Criminal No. 11.66.

¶ 64     Under the plain error doctrine, we may consider issues that were forfeited at trial if (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice or (2) the claimed error was so fundamental that it undermined the fairness of the defendant's trial or the integrity of the judicial process. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Where, as happened here, jurors are properly instructed on how to assess the credibility of witnesses, failure to also provide IPI Criminal No. 11.66 may not be reviewed under the second

20

prong of the plain error test. *Sargent*, 239 Ill. 2d at 190-94. Thus, as both parties point out, we may only consider this instructional error if we find the evidence to be closely balanced.

¶ 65    In determining whether review is appropriate under the closely-balanced prong of the plain error rule, the question before us is whether the evidence was so close that "the error alone severely threatened to tip the scales of justice." *Sebby*, 2017 IL 119445, ¶ 51. The defendant bears the burden of persuasion on this question. *People v. Choate*, 2018 IL App (5th) 150087, ¶ 52.

¶ 66    The defendant argues that the evidence was closely balanced and that the omission of this instruction was particularly prejudicial in this case. He notes that the journal entry was left by M.F. to be found by her sister, K.F., shortly after it was revealed that K.F. had engaged in sexual activity with Devon Murphy. The defendant postulates that M.F. might have been motivated to write the journal entry by a desire to gain her sister's acceptance and respect by saying that she had also had a sexual encounter. He suggests that once her sister showed the journal entry to her parents, M.F. might have felt that she had to continue to lie. The defendant argues that, in light of these alleged deficiencies, it was crucial that jurors be told that they should consider the circumstances surrounding the journal entry and that they had the option to find that M.F. never made the statements to her family. We are not persuaded.

¶ 67    Much of the defendant's argument concerning the particular scrutiny that should have been given to M.F.'s statements in this case is based on pure speculation that she had ulterior motives. Moreover, we believe the evidence in this case was quite strong. Jurors saw M.F. testify live, giving them the opportunity to observe her demeanor on the witness stand and assess her credibility. Likewise, they had the opportunity to observe her demeanor in the recorded interviews with Ginger Meyer and Sgt. Brown. Significantly, M.F.'s trial testimony and the

21

detailed accounts she gave to Meyer and her father were consistent. (We note that the other statements M.F. made were consistent as well but did not include many of the details included in her testimony and in her statements to Meyer and her father.)

¶ 68    M.F.'s account of the relevant incident is also corroborated by the testimony of multiple family members who described changes in her demeanor following the overnight visit to Stephanie Murphy's house. The defendant suggests that M.F.'s family members are not credible because they are not unbiased witnesses. However, their credibility was a question to be resolved by the jury because the jury was in the best position to make that determination. See *People v. Wallace*, 2020 IL App (1st) 172388, ¶ 30.

¶ 69    It is worth noting that portions of M.F.'s story were also corroborated by the defendant in his statement to police. As noted previously, he admitted to sleeping next to her in the sleeping compartment of his truck on the Kansas City trip, and he admitted to touching the girls' breasts playing the "scooping" game.

¶ 70    The defendant further contends that the evidence is closely balanced because the State's evidence was contradicted by the testimony of the defense witnesses—Stephanie Murphy, Karen Sovar, and Leta Carr. As we have just stated, however, which witnesses to find credible was a question for the jurors, as finders of fact. The evidence is not closely balanced merely because there was conflicting testimony. We conclude that the evidence in this case is not closely balanced enough to warrant consideration of this instructional error under the plain error doctrine.

¶ 71    The defendant also argues that his trial counsel was ineffective for failing to tender this jury instruction. To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was deficient because it fell below an objective

22

standard of reasonableness and that the defendant was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). To demonstrate prejudice, the defendant must show that if not for counsel's mistakes, there is a reasonable probability that the result at trial would have been different. *Id.* at 694. A defendant must satisfy both prongs of the *Strickland* test to prevail on his claim. *People v. Coleman*, 183 Ill. 2d 366, 397 (1998). Thus, if it is easier to resolve the claim by addressing only the prejudice prong, we may do so. *Id.* at 397-98.

¶ 72    Here, we do not believe the defendant can demonstrate a reasonable probability that the outcome of his trial would have been different had counsel tendered IPI Criminal No. 11.66. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. As we have just discussed, the evidence of the defendant's guilt in this case, while not wholly uncontroverted, was overwhelming. As we have also mentioned, the jury was properly instructed on assessing the credibility of witnesses. We do not believe it is reasonably probable that the additional instruction would have changed the outcome of the trial. We therefore reject the defendant's claim of ineffective assistance of counsel.

¶ 73                                    C. Rule 431(b)

¶ 74    The defendant next argues that the court failed to fully comply with Rule 431(b) by "collapsing the four fundamental principles of law" addressed by the rule "into a single statement." The defendant recognizes that he did not object during *voir dire*. However, he urges us to consider his claim under the plain error doctrine, arguing that the evidence was closely balanced. We are not persuaded.

¶ 75    Rule 431(b) requires trial courts to explain the following four principles to prospective jurors during *voir dire*: (1) that the defendant is presumed innocent of the offenses charged; (2) that the State must prove the defendant's guilt beyond a reasonable doubt; (3) that the

defendant is not required to present any evidence; and (4) that the defendant is not required to testify, and if he chooses not to do so, jurors may not draw any negative inferences from this fact. Ill. S. Ct. R. 431(b) (eff. July 1, 2012). The rule further requires courts to ask all prospective jurors whether they both understand and accept each of these principles. *Id*. These principles are known as the *Zehr* principles. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010); see also *People v. Zehr*, 103 Ill. 2d 472, 477 (1984).

¶ 76    Failure to object to the court's questioning during *voir dire* forfeits appellate review of any claimed *Zehr* error. *People v. Belknap*, 2014 IL 117094, ¶ 47. Because failure to fully comply with Rule 431(b) is not a structural error, it cannot be reviewed under the second prong of the plain error rule, which allows for review of serious errors. *People v. Birge*, 2021 IL 125644, ¶ 24.

¶ 77    The first step in plain error analysis under either prong is to determine whether an error occurred at all. *Id.* We review *de novo* whether a trial court has complied with the requirements of Rule 431(b). *People v. Wilmington*, 2013 IL 112938, ¶ 26.

¶ 78    Here, the trial court provided each panel of prospective jurors with the following instructions:

"Do you understand and agree, as a juror, that a person is presumed innocent until proven guilty beyond a reasonable doubt?

Do you understand and agree, as a juror, that the presumption of innocence remains with a person throughout the trial?

Do you understand and agree, as a juror, that before a person can be convicted of the charges, the State has the sole burden and must prove the person guilty beyond a reasonable doubt?

24

Do you understand and agree, as a juror, that a person is not required to offer any evidence on his or her own behalf?

Do you understand and agree, as a juror, that a person does not have to testify and that if he or she does not testify, that cannot be held against them?

Do you understand and agree, as a juror, that you must follow the law as instructed by the Court even though you might disagree with it?

And, lastly, do you understand and agree, as a juror, that you are not to be concerned with the possible sentence if a person is found guilty of a crime?"

The court then addressed each prospective juror in the panel by name, asking each, "Do you understand and agree with those principles?"

¶ 79    The defendant argues that by presenting the four *Zehr* principles in this manner, the trial court impermissibly condensed the principles into a single "broad statement of law." He further contends that the court compounded its error by addressing additional principles of law in its single statement.

¶ 80    While this matter was pending on appeal, the Illinois Supreme Court addressed the question before us in *People v. Birge*. There, the trial court presented the four *Zehr* principles to prospective jurors as follows:

" 'A person accused of a crime is presumed to be innocent of the charge against him. The fact that a charge has been made is not to be considered as any evidence or presumption of guilt against the Defendant.

The presumption of innocence stays with the Defendant throughout the trial and is not overcome unless from all of the evidence you believe the State proved the Defendant's guilt beyond a reasonable doubt.

25

The State has the burden of proving the Defendant's guilt beyond a reasonable doubt. The defendant does not have to prove his innocence. The Defendant does not have to present any evidence on his own behalf and does not have to testify if he does not wish to. If the Defendant does not testify, that fact must not be considered by you in any way in arriving at your verdict.' " *Birge*, 2021 IL 125644, ¶ 4.

The court then asked the prospective jurors, " 'So[,] by a show of hands, do each of you understand these principles of law?' " *Id.* After seeing that all prospective jurors raised their hands, the court asked them if they accepted the four principles. *Id.*

¶ 81    On appeal, the defendant argued that the trial court erred "by grouping the principles into one broad statement of law," thereby failing to ensure that all prospective jurors "understood and accepted each of the four distinct concepts enumerated" in Rule 431(b). *Id.* ¶ 23. In rejecting this claim, the supreme court emphasized that the trial court read each of the four principles to the prospective jurors "verbatim" and asked all prospective jurors whether they both understood and accepted the four principles. *Id.* ¶¶ 27, 37-38. The supreme court explained that Rule 431(b) does not require trial courts to "recite the four principles separately." *Id.* ¶ 34. The court thus rejected the defendant's claim that the trial judge's explanation of the four principles was the type of "broad statement of applicable law" criticized in the committee comments to the rule. *Id.* ¶¶ 37-38; see Ill. S. Ct. R. 431(b), Committee Comments.

¶ 82    The trial court's recitation of the four *Zehr* principles in this case was similar to that of the trial court in *Birge*. In both cases, the trial courts explained each of the four principles to the prospective jurors in language similar to that contained in Rule 431(b). In this case, the trial judge set forth each principle as a distinct concept even though it did not pause between them to question the prospective jurors. In *Birge*, the judge set forth the first two principles as distinct

26

concepts but gave an explanation that combined the third and fourth principles. See *Birge*, 2021 IL 125644, ¶ 4. Under the supreme court's holding in *Birge*, we find that the court's explanation of the *Zehr* principles in this case was not the type of "broad statement of law" that Rule 431(b) was meant to prevent.

¶ 83    There is one distinction between this case and *Birge*, however. As the defendant emphasizes, the court in this case recited two additional principles of law to the prospective jurors before asking them if they understood and accepted the principles, while in *Birge*, the court limited its discussion to the four principles. See *id*. ¶¶ 4, 36. The defendant argues that this was a clear and obvious error. He contends that it was "remarkably difficult" for prospective jurors to focus on the principles discussed by the court or "to recall each principle when finally asked if they understood and accepted everything the court had said." He argues that the court therefore failed to provide prospective jurors "with a fair opportunity to assess [whether] they understood and agreed with each principle."

¶ 84    There is some language in *Birge* to support the defendant's position. The *Birge* court distinguished the facts and circumstances of the case before it from cases cited by the defendant in which the appellate courts found that the trial courts failed to fully comply with Rule 431(b). The supreme court explained that in those decisions, the appeals courts found error not "in how the [trial] court presented the four principles," but because the trial "court failed to ask if the prospective jurors understood and accepted all four principles or omitted a principle altogether." *Id.* ¶ 36. The supreme court further explained that the trial court in *Birge* explained the four principles "without interspersing *** other instructions." *Id.*

¶ 85    In making that observation, the supreme court was distinguishing *People v. McCovins*, 2011 IL App (1st) 081805, a case cited by the defendant in this case. In *McCovins*, the First

27

District held that the trial court erred when it "provided the prospective jurors with a broad statement of legal principles interspersed with commentary on courtroom procedure and the trial schedule, and then concluded with a general question about the potential jurors' willingness to follow the law." *Id.* ¶¶ 36-37.

¶ 86　The instant case is distinguishable from *McCovins* in two key respects. There, the trial court gave prospective jurors a lengthy explanation of legal principles, including the purpose of an indictment, all four *Zehr* principles, the fact that jurors must judge the defendant's credibility the same as that of any other witness should he choose to testify, and the principle that they must follow the law as instructed. *Id.* ¶¶ 30-31. Unlike what occurred in this case, the court did not break its explanations down into distinct principles. See *id.* Moreover, unlike what happened here, the trial court in *McCovins* asked only if prospective jurors felt that they could not abide by the principles discussed; the court did not ask if they understood the principles. *Id.* ¶ 31. As mentioned previously, however, the *Birge* court specifically noted that unlike the trial court in *McCovins*, the trial court in *Birge* explained the four principles "without interspersing *** other instructions." *Birge*, 2021 IL 125644, ¶ 36.

¶ 87　We need not determine whether the court in this case erred by addressing two additional principles. As we explained earlier, we may only consider this question under the plain error doctrine in cases where the evidence is closely balanced, and we have already found that the evidence in this case was not closely balanced. Thus, even assuming the court erred, the defendant is not entitled to review of his 431(b) claim under the plain error doctrine.

¶ 88　The defendant also asks us to consider whether counsel was ineffective for failing to object to the court's handling of the *Zehr* principles during *voir dire*. As stated previously, if we find that the defendant was not prejudiced by counsel's purported error, we may reject his claim

28

of ineffective assistance based solely on that conclusion. See *Coleman*, 183 Ill. 2d at 397-98. As we discussed earlier, the evidence in this case was overwhelming. We may therefore reject the defendant's claim of ineffective assistance of counsel because he cannot satisfy his burden of demonstrating a reasonable probability of a different outcome.

¶ 89                                    D. Sentencing

¶ 90    Finally, the defendant argues that the court abused its discretion in sentencing him to a total of 50 years in prison. There are four components to his argument. First, he contends that the court fashioned a "*de facto* life sentence" that is disproportionate to the nature of the offenses. Second, he argues that the court completely overlooked the mitigating evidence. Third, he argues that the need to deter others does not support an aggregate sentence of 50 years. Fourth, the defendant argues that the sentence was based on "improper speculation" about other crimes he may have committed. We note that the defendant did not challenge his sentence before the trial court. He urges us to consider his arguments under the plain error doctrine or as ineffective assistance of counsel. We find no error, much less plain error.

¶ 91    Trial courts enjoy broad discretion in sentencing. The trial court is in a better position than we are to determine the appropriate sentence to impose because that court had the opportunity to assess and weigh factors such as the defendant's credibility, demeanor, moral character, social environment, age, and habits. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). For this reason, we give the trial court's sentencing decision great deference. *Id*. We will not alter a defendant's sentence absent an abuse of the trial court's discretion. *Id*. at 209-10; *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. A sentence that is within the statutorily prescribed range is presumed to be proper. We will not find such a sentence to be an abuse of discretion unless it

29

is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999).

¶ 92    The defendant argues that his sentence was manifestly disproportionate to the nature of the offense. This is so, he contends, because he received a "*de facto* life sentence" even though M.F. was not injured physically. We disagree.

¶ 93    We first note that the defendant's sentence meets the supreme court's definition of a "*de facto* life sentence" because it is longer than 40 years. See *People v. Buffer*, 2019 IL 122327, ¶¶ 41-42. However, the defendant has not pointed to any Illinois cases holding that the limitations on imposing *de facto* life sentences on juveniles are ever applicable to a 38-year-old adult defendant, and we are aware of no such cases.

¶ 94    More fundamentally, we do not find the sentences imposed to be disproportionate to the nature of the offenses. Although the defendant is correct in noting that M.F. was not physically injured, the record establishes that she suffered a great deal of emotional distress as a result of the defendant's conduct. Multiple witnesses testified that her demeanor changed noticeably after the incident at issue occurred. She became withdrawn and less happy and playful. In her statement to the court during the sentencing hearing, which took place five years after the assault, M.F. told the court that she was still impacted by the defendant's conduct. In addition, she stated that her sister, K.F., felt a great deal of guilt for having been unable to protect M.F.

¶ 95    It is important to recognize that the sentences imposed for this conduct were in the middle of the statutorily prescribed sentencing range. Predatory criminal sexual assault of a child is a Class X felony with a sentencing range of 6 to 60 years. 720 ILCS 5/11-1.40(b) (West 2016). Consecutive sentences for multiple counts of the offense are mandatory. 730 ILCS 5/5-8-4(d)(2) (West 2016). Thus, the defendant's 25-year sentences were in the middle of the applicable

30

sentencing range, somewhat closer to the minimum permissible sentences than to the maximum sentences.

¶ 96    This case stands in stark contrast to *Stacey*, where our supreme court found a defendant's sentences to be disproportionate to the nature of the offenses. See *Stacey*, 193 Ill. 2d at 210. There, the defendant was convicted of one count of aggravated criminal sexual abuse and one count of criminal sexual abuse. *Id*. at 205. Neither charge was a Class X felony, but because of the defendant's prior unrelated convictions, he was subject to sentencing as a Class X offender. *Id*. at 210 (citing 730 ILCS 5/5-5-3(c)(8) (West 1994)). The sentencing range for most Class X felonies is 6 to 30 years. *Id*. The defendant's sentences of 25 years each were within this range (*id.*), but, unlike the sentences imposed in this case, they were near the upper end of that range. The supreme court found the sentences to be disproportionate to the nature of the offenses, during which "[the] defendant momentarily grabbed the breasts of two young girls, who were fully clothed at the time." *Id*.

¶ 97    Here, by contrast, the defendant forcibly removed M.F.'s pajamas, made contact between his penis and her vagina, then inserted his fingers into her vagina. Although the record does not reveal how long this went on, it appears to have been more than momentary contact. In addition, when M.F. cried and screamed in response, the defendant added to her distress by telling her no one could hear her scream. Moreover, as we have already discussed, the sentences imposed in this case are in the middle of the statutorily prescribed sentencing range for the offense charged. In *Stacey*, the offenses charged were Class 2 felonies (*id.*), which would ordinarily have been subject to a sentencing range of three to seven years (see 730 ILCS 5/5-8-1(a)(5) (West 1994) (now at 730 ILCS 5/5-4.5-35(a) (West 2020))). Thus, not only were the sentences imposed in that case towards the upper end of the Class X sentencing range applicable to the defendant

31

because of his prior convictions, they also far exceeded the maximum sentence normally applicable to the charged conduct. That is not the case here. We do not find the defendant's sentences in this case to be manifestly disproportionate to the nature of the offenses he committed.

¶ 98    The defendant next claims that the trial court abused its discretion by ignoring mitigating evidence. We disagree.

¶ 99    Although the court is required to consider all relevant factors in mitigation and aggravation (*Busse*, 2016 IL App (1st) 142941, ¶ 22), it is not required to recite or assign a value to each factor it considered (*People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11). The court is presumed to consider any mitigating evidence placed before it and to consider all relevant factors. To overcome this presumption, the defendant must affirmatively demonstrate that the court failed to consider relevant factors. *Id.* To do so, he must point to something other than the sentence itself. *Busse*, 2016 IL App (1st) 142941, ¶ 23.

¶ 100   Here, the defendant argues that the court failed to consider any mitigating evidence he presented. In support of this claim, he emphasizes that the court did not mention any of the mitigating evidence. However, as stated, the court is not obligated to expressly recite the factors it considered. We thus find that the defendant has not overcome the presumption that the trial court considered all relevant evidence in mitigation.

¶ 101   The defendant further argues that his sentence was not justified by the need to deter others. He contends that "to the extent that the public can be deterred from committing sex offenses through the punishment of another person, the *fact* of that punishment, not *the excessive length* of punishment, serves that purpose." (Emphases in original.) We are not convinced. The

defendant's argument overlooks the fact that the need to deter others is a factor in aggravation our legislature expressly found to be relevant. See 730 ILCS 5/5-5-3.2(a)(7) (West 2016).

¶ 102 Finally, the defendant argues that the sentence was based, in part, on improper speculation about other crimes committed by the defendant. He points to the trial judge's statement that in addition to M.F. and the two other teenaged victims about whom evidence was presented, he was "positive there [were] others." The defendant also points to the judge's statement about the need to protect young girls all over the country from the defendant. We reject the defendant's contention.

¶ 103 In determining whether the trial court considered any improper factors, it is essential that this court consider the record as a whole, rather than focusing on "a few words or statements" made by the trial court. *People v. Ward*, 113 Ill. 2d 516, 526-27 (1986). Here, the court explicitly stated that the most important factor was the need to protect the public from the defendant. That is always a valid consideration in sentencing. See *People v. Jones*, 2019 IL App (1st) 170478, ¶ 49.

¶ 104 The record contains ample evidence to support the court's finding. First, there was evidence of additional uncharged conduct involving the victim in this case and her sister. There was evidence that the defendant touched the breasts of both M.F. and K.F. on at least two occasions, if not more. M.F. testified that he played the "scooping" game with them both at Stephanie Murphy's house and at the Alvis home. There was also evidence that the defendant sexually assaulted M.F. during the overnight trip to Kansas City. According to M.F., he told her that he put his hand in her pants while she slept.

¶ 105 Second there was evidence that the defendant engaged in an ongoing pattern of inappropriate behavior with two other teenaged girls while he was on bond between trials in this

case. As the court pointed out, the defendant contacted the 11-year-old Ohio girl, H.S., very soon after posting bond in this case. As the court also pointed out, this violated a condition of his bond, which provided that the defendant was not to have contact with girls under the age of 18. There was also evidence that after sexually assaulting C.A., the 13-year-old daughter of his girlfriend, the defendant attempted to arrange for another opportunity to have sex with C.A.

¶ 106   Based on the totality of this evidence, the court rightly found that the defendant was highly likely to reoffend. It is in this context that we must view the court's comment concerning the likelihood that the defendant had committed other offenses. Read in context, the court was simply commenting on the defendant's character, his likelihood to reoffend, and the need to protect the public from him. Moreover, having reviewed the transcript of the sentencing hearing as a whole, it is clear to us that the court emphasized the evidence properly before it in determining that a lengthy sentence was needed to protect the public. We therefore conclude that the court properly exercised its discretion in sentencing the defendant.

¶ 107                                      III. CONCLUSION

¶ 108   For the foregoing reasons, we affirm the defendant's convictions and sentences.


¶ 109   Affirmed.